## HOUSTON OIL. CO. OF TEXAS et al. v. NILES et al. (No. 353–3111.)

(Commission of Appeals of Texas, Section B. Oct. 24, 1923. Rehearing Denied Nov. 21, 1923.)

**1. Evidence ⬅366(5) — Authenticated and certified copy of act of sale before notary public of parish of Louisiana conveying land in Republic of Texas competent.**

The original of an act of sale before the notary public for a parish of Louisiana, being an archive of the notarial records of the parish, a copy thereof duly authenticated by the proper custodian, and certified as required by federal statutes, is competent to prove the act of sale in 1839, conveying lands in the Republic of Texas.

**2. Adverse possession ⬅13—Concurrence of adverse possession for five years, and payment of taxes before delinquent, necessary.**

For title under the five-year statute, concurrent adverse possession and payment of taxes before delinquent for that period must be shown.

**3. Adverse possession ⬅115(1)—Evidence under ten-year statute sufficient for jury, but not for directed verdict.**

Evidence of title by adverse possession under the ten-years' statute, *held* sufficient for the jury, but not a directed verdict.

**4. Adverse possession ⬅102—Leases held not restrictive, so that landlord's possession through tenants by construction extended to limits of boundaries of record title.**

Instruments severally executed by each of two squatters on different parts of a league of

land, to which I. had a recorded deed, reciting that, in consideration of the use, occupancy, and enjoyment, rent free "of the house, field, and improvements now occupied by me" on said league, and the right to use any timber necessary for fuel and repairs, "I acknowledge myself the tenant of and to be in possession for I., the owner of said league, * * * and agree as such tenant to occupy and hold possession of said league," *held* not restrictive leases; so that the landlord's possession through the tenants extended by construction to the entire league.

**5. Adverse possession ⊙═102 — Landlord's constructive possession through tenants held not affected by one tenant's buying other's interest.**

The constructive possession of I. to a league of land of which he had a deed, through H. and G., who, having severally been squatters on different parts of it, took leases from I., under which each had actual possession of the tract which he cultivated and on which he lived, and constructive possession of the entire league, by virtue of the relation of tenancy, was not affected by H. buying out G.'s interest, and moving onto the part actually occupied by G.; the situation being controlled by the rule, applying to any one in privity with a tenant, that a tenant cannot dispute the title of his landlord, or assert a claim either in himself or others adverse thereto, till he terminates his tenancy by surrendering to his landlord the possession which he had received from him.

**6. Deeds ⊙═25—Conveyance of all right, title, interest, and claim, which grantors have in land, quitclaim; "quitclaim deed."**

A deed of "all the right, title, interest, and claim which we have in and to" certain land, with undertaking to warrant and defend all such right, title, and interest, is a quitclaim.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Quitclaim Deed.]

**7. Vendor and purchaser ⊙═224—Quitclaim in chain of title fatal to claim of innocent purchasers.**

The holder of a title, in which there appears, however remote, a quitclaim deed, may not assert the claim of innocent purchaser as against an outstanding title or secret trust or equity existing when the quitclaim was executed; and is not merely put on reasonable inquiry.

**8. Evidence ⊙═336(1)—Under act 1840 deed acknowledged before notary subject to registration.**

From the date of Act Feb. 5, 1840 (Laws of Republic, 1839–40, p. 153), a deed could be acknowledged before a notary public, so that, being so acknowledged, it was subject to registration, relative to admissibility of the record in evidence.

**9. Evidence ⊙═336(2)—Menard county records of deeds validated.**

Records of deeds in the judicial county of Menard, created in 1841 out of a part of Lib-erty county, by an unconstitutional act of the Republic of Texas, were validated by Act Jan. 6, 1844 (Laws of Republic 1844, p. 11), declaring that duly proven deeds, previously filed for record with the clerk of the county court of Menard, shall have from the time of their filing the same legal effect as if duly recorded with the clerk of the county court of Liberty county, and providing for delivery to the county clerk of Liberty county of the Menard county records—so that a properly authenticated copy of such a deed from the records of Tyler county, created in 1846 with boundaries the same as those of Menard county, is not subject to objection on account of the original invalid record.

**10. Evidence ⊙═181—For introduction of copy of recorded deed against affidavit of forgery of original, proper predicate to be laid for secondary evidence.**

That a certified copy of a recorded deed may be introduced as secondary evidence of the original, not produced, as against an affidavit of forgery, Rev. St. art. 3700, must be complied with as regards laying the proper predicate for secondary evidence, by affidavit of loss of or inability to produce the original.

**11. Vendor and purchaser ⊙═224—Deed of trustee to heir of cestui que trust held not a quitclaim.**

A deed, the consideration for which is recited to be the fact that grantor was merely a trustee for the deceased father of grantee, and never had any title further than that he held the legal title in trust for him, *held* to have for its purpose the conveyance of the land, and not a mere chance of title, and not to be a quitclaim as respects the question of innocent purchaser, though in the granting clause, after reciting conveyance of the land, using the words "so far as any title now is or ever has been vested in me."

On Motion for Rehearing.

**12. Evidence ⊙═343(1) — Statute validating prior record of instrument acknowledged before notary held to validate such prior acknowledgment for future recording, thus removing objection to certified copy as evidence.**

Act Feb. 5, 1841 (2 Gammel's Laws, p. 632) § 20, providing that an instrument required or permitted to be recorded, and which "shall have been heretofore registered," shall be held to have been duly registered, with the full force and consequences of existing laws, provided it shall have been acknowledged before "any notary public," validated for purpose of future recording an instrument theretofore so acknowledged, though not then recorded, thus removing objection to admission in evidence of an authenticated certified copy, from the notarial records of Louisiana, of an act of sale, in 1839, of lands in the Republic of Texas, before a notary public of Louisiana, though at the time of its date a notary was not authorized, under the laws of Texas, to take acknowledgment to deeds, so as to make them admissible to record.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Action by Horace Wold against the Houston Oil Company of Texas and others, Edith L. Niles and others intervening. Judgment for defendants was reversed, and judgment rendered for interveners (in the opinion hereafter referred to as plaintiffs) by the Court of Civil Appeals (191 S. W. 748), and defendants bring error. Reversed, and remanded for new trial.

H. O. Head, of Sherman, Parker & Kennerly, of Houston, Oswald S. Parker, of Beaumont, for plaintiffs in error.

W. D. Gordon and Thos. J. Baten, both of Beaumont, for defendants in error.

McCLENDON, P. J. This was a suit in trespass to try title, involving a league of land in Hardin county granted in 1835 to George W. Brooks as a colonist. The parties to the suit, Edith L. Niles et al., will be referred to as plaintiffs, and Houston Oil Company et al. as defendants, the relative positions they in effect occupied at the time of the trial. The trial court, upon a directed verdict, rendered judgment for defendants. This judgment was reversed, and judgment rendered for plaintiffs by the Court of Civil Appeals (191 S. W. 748).

We have reached the conclusion that the cause should be remanded to the district court for a new trial; and therefore that all questions of substantial importance raised by either party should be adjudicated.

[1] Plaintiffs deraign title through a deed executed by George W. Brooks on February 3, 1836, conveying the land to Arthur Henrie. The latter, on February 22, 1839, conveyed to Thomas Sloo, Jr., who, in turn, on April 12, 1839, conveyed to James W. Byrne by an act of sale before William Christy, notary public for the parish of Orleans, state of Louisiana. The original of this act of sale was an archive of the notarial records of said parish, and was therefore not introduced in evidence, proof being made by duly authenticated copy by the proper custodian, certified as required by federal statutes. Plaintiffs' chain of title from James W. Byrne is in all respects regular. Objection to the introduction of this certified copy was made upon the ground that it was not competent in this manner to prove an act of sale conveying lands in the Republic of Texas, where the act of sale was in the archives of another jurisdiction; because the records of such jurisdiction, in so far as they deal with lands in Texas, are not proper archives of such jurisdiction, and a certified copy thereof is incompetent as evidence without proof of the execution of the original. These objections were properly preserved by bill of exceptions; but this bill was not embraced in the transcript filed in the Court of Civil Appeals. Defendants sought to have the record on appeal corrected in this regard by certiorari. This was denied by the Court of Civil Appeals, on the ground that the application for certiorari came too late. Therefore the question was not passed upon in that court. In view of the fact that this question will be important upon another trial of the case, we think it should be passed upon, regardless of the correctness of this ruling.

Under the authorities, we think there can be no doubt but that the trial court properly overruled the objection to the admission in evidence of the certified copy. Smith v. Townsend, Dallam Dig. 570; Watrous' Heirs v. McGrew, 16 Tex. 506; Williams v. Conger, 49 Tex. 600; Smith v. Gillum, 80 Tex. 120, 15 S. W. 794; Lumber Co. v. Pinckard, 4 Tex. Civ. App. 671, 23 S. W 720, 1015 (writ of error refused); McCarty v. Johnson, 20 Tex. Civ. App. 184, 49 S. W. 1098; Owings v. Hull, 9 Pet. 625, 9 L. Ed. 246. The following quotation from the Watrous Case has been repeatedly referred to with approval:

"The objections taken to the admission in evidence of the act of sale of the 14th of April, 1838, passed before the notary public in Louisiana, did not go to question the official character of the notary or the due execution of the conveyance. Proof upon these points, therefore, was unnecessary, and must be deemed to have been waived. But, if not, the act of the notary was authenticated under the Act of Congress of·the 27th of March, 1804, to the form of which there was no objection, and which must be deemed proof of its genuineness and authenticity. Laws, of which we judicially take notice, recognize the Civil Code and Code of Practice of Louisiana as law in that state. Hart. Dig. pp. 18, 321; and see Ordinances, etc., of the Consultation. We therefore must judicially take notice that they are so. We must also take notice of the Spanish law, in force here at the date of the act in question; we must know that the act duly attested makes proof in Louisiana; that the original act of sale remained an archive in the office of the notary; consequently the plaintiffs could not be required to produce it; and its nonproduction was not a valid objection to the admission of the evidence produced by them."

Frost v. Wolf, 77 Tex. 455, 14 S. W. 440, 19 Am. St. Rep. 761, and Lumber Co. v. Gwin (Tex. Civ. App.) 52 S. W. 110, are cited by defendants as holding the contrary. The latter case appears to support defendants' contention. If so, it is directly in conflict with the decisions of the Supreme Court above cited. It does not appear to have reached the Supreme Court.

If we correctly understand the Frost Case, the copy there introduced in evidence was not a certified copy of the matrix or protocol duly authenticated by the proper custodian, but was the testimonio, which, under the previous authorities was clearly not admissible in evidence without proof of its execution. This question is fully discussed in Judge Williams' opinion in the above-cited case of McCarty v. Johnson. No authorities are cited by the Supreme Court in support of the holding in

Frost v. Wolf, and the only authorities cited in briefs of counsel in support of their contention that the copy offered in evidence was not admissible are Hutchins v. Bacon, 46 Tex. 415; and Wood v. Welder, 42 Tex. 408, which cases deal with the admissibility of the testimonio and not certified copy of the protocol. We hardly think the Supreme Court would have rendered a decision overruling a long line of previous decisions of that court without at least calling attention to those decisions. We cannot but conclude that the Frost Case has no bearing upon the question now under consideration.

[2] Defendants assert title in themselves under two separate theories: By limitation under the five and ten years' statutes; and as bona fide purchasers.

In order to recover under the five years' statute, the burden rested upon them to show both adverse possession and the payment of taxes prior to the time they became delinquent. Baker v. Fogle, 110 Tex. 301, 217 S. W. 141, 219 S. W. 450; Oil Co. v. Jordan (Tex. Com. App.) 231 S. W. 320. There is no consecutive period of five years' duration in which such payment is shown prior to the year 1905. And, from 1905 to 1911, inclusive, the record in its present condition does not, we think, afford sufficient evidence of adverse possession to warrant submission of that issue to a jury.

[3] The evidence of adverse possession, as supporting the plea of limitation under the ten years' statute rests entirely upon the testimony of one S. A. J. Hare, who attorned in 1883 to E. H. Irvin, defendants' then predecessor in title. Hare's testimony is set out in full in the opinion of the Court of Civil Appeals, and need only be stated briefly here. Aside from the objections to its sufficiency hereinafter considered, we are clear in the view that it was sufficient to carry the case to the jury; but we do not think it is of such conclusive character as to support a directed verdict for defendants.

[4] Hare, who was a squatter on the eastern end of the league, and one Calvin Gore, a squatter on the western end of the league, each attorned to E. H. Irvin by written instrument dated October 23, 1883, and recorded the following day. The body of these instruments reads as follows:

"For and in consideration of the use occupancy and enjoyment, rent free, of the house, field, and improvements, now occupied by me, and situated on the league of land in said county, granted to G. R. Brooks on the 22d day of August, A. D. 1835, by the government of Coahuila and Texas, and in further consideration of the right granted me to make use of any timber necessary for firewood, and to keep in repair the fence and houses—part of said improvements, I acknowledge myself the tenant of and to be in possession for E. H. Irvin, the owner of said league of land, and agree as such tenant to occupy and hold possession of said league of land."

On July 7, 1890, Hare executed another acknowledgment of tenancy in favor of John P. Irvin, in terms substantially the same as his previous acknowledgment of tenancy. This instrument was recorded on July 10, 1890, There were other acknowledmgnts of tenancy not necessary to notice.

Plaintiffs contend · that these leases are restrictive, and do not carry the possession of the tenant holding thereunder beyond the boundaries of his actual possession. This question has been before the Texas courts a number of times, but has never been passed upon by the Supreme Court, unless the case of Oil Co. v. Kimball, 103 Tex. 94, 122 S. W. 533, 124 S. W. 85, may be considered authority upon the question. Other cases·upon the subject are Frazier v. Oil Co. (Tex. Civ. App.) 161 S. W. 20; Word v. Colley (Tex. Civ. App.) 173 S. W. 629; Hanks v. Oil Co. (Tex. Civ. App.) 173 S. W. 635; and Oil Co. v. Village Mills Co. (Tex. Com. App.) 241 S. W. 122. In each of these cases the leases under consideration were substantially the same as the leases in the present case, and some of them were in the identical ·language. In the Frazier Case the authorities are reviewed, and the conclusion is reached that leases of this character are not restrictive, but possession under them by the tenant will by construction carry the possession of the landlord to the extent of the boundaries of his record title. The Kimball Case was reviewed, and held not to be in conflict with this holding. The question later came up in the Colley and Hanks Cases, in which the holding in the Frazier Case was followed. In each of the two latter cases the Supreme Court denied a writ of error. The question again arose in the Village Mills Case, in which, after a review of the authorities, this section of the Commission followed the holdings in the Frazier, Colley, and Hanks Cases. The question was not essential to the decision in ·the Village Mills Case, and for that reason the Supreme Court in approving the conclusions of the Commission did not ·pass upon this particular question, since the judgment recommended by·the Commission could be upheld on other grounds.

We think it unnecessary to do more than refer to the cases upon this subject and to the very full discussion thereof in Judge Powell's opinion in the Village Mills Case. We see no reason why the views then entertained by us should not be adhered to, and we therefore conclude that the leases involved in this suit were not restrictive, but the possession of the landlord through his tenants Gore and Hare extended by construction to the entire league.

[5] The only remaining question affecting the issue of limitation is whether or not the action of Hare in moving from the eastern end of the league onto the tract on the western end previously occupied by Gore, and the assertion by Hare that he bought out the then

occupant of that tract, and claimed the tract as the property of his wife, constitutes a break in the possession of the landlords of Hare. We think this question should be answered in the negative.

Hare's testimony in this regard may be thus briefly summarized: From 1883 to 1888 he occupied a house, and cultivated a small field on the eastern end of the league. In 1888 he moved to the tract on the western portion of the league, which was previously occupied by Gore. This tract he purchased from one Gibson, who had acquired by mesne transfers Gore's interest in the property. Hare states that at the time he moved to the Gore place he did so, because he wished to marry, and his prospective wife was not willing to live on the east end of the league, which was in the bottom, but insisted on Hare's getting a place for her in a more healthy locality. He then, as stated by him, "saddled old Blue," and rode over to the Gore place, and made the deal by which he acquired Gibson's interest in the Gore tract. He testified that he claimed the Gore tract consisting of 50 acres from the time he moved there until he executed the acknowledgment of tenancy in 1890. In 1897 he moved off the Gore tract, and his son-in-law, Bill Goins, took possession, and held the place for one or two years under Hare. With reference to the possession from that time on the witness states:

"He (Goins) stayed on the place until Ike Gore took possession, but I can't tell you how long Gore stayed there—he has never moved off that I know of, he has been right there ever since he moved there, and he has cultivated some of the land every year. I don't know whether Ike Gore is sick or not, but that is what I heard, that he is sick in bed, and he is not here in court, if he is, I haven't seen him; it is my understanding that he is sick."

The general rule that the tenant cannot dispute the title of his landlord or assert a claim either in himself or others adverse thereto so long as he occupies the rented premises has been frequently applied in this state in a variety of contingencies. Carter v. LeGrange, 60 Tex. 636; Flanagan v. Pearson, 61 Tex. 302; Juneman v. Franklin, 67 Tex. 411, 3 S. W. 562; Hurley v. Lockett, 72 Tex. 262, 12 S. W. 212; Cobb v. Robertson, 99 Tex. 138, 86 S. W. 746, 87 S. W. 1148, 122 Am. St. Rep. 609; Benskin v. Barksdale (Tex. Com. App.) 246 S. W. 361. See, also, generally, 2 Corpus Juris, p. 74, § 49, and authorities there cited. No good reason is advanced why this principle should not apply in all its force to a case where the landlord is seeking to establish possession in himself through his tenant against the attack of a stranger. Both Hare and Gore held actual possession of the tracts which they cultivated and upon which they lived, and were in constructive possession of the entire league by virtue of the relation of tenancy. That possession was hostile to all the world except their landlords. Had the plaintiffs in this suit attempted to gain possession of the land through attornment, to them by the tenants of defendants or any one holding under them they could not have done so. Had they, with the consent of the tenants or those in privity with them, gone into actual possession of the premises, they could not have asserted title against the defendants without yielding up the possession which they had thus received. These principles are well established generally, and particularly by the above Texas authorities. The possession of any part of the league by Hare was the possession of the defendants or those under whom they claim until such time as Hare terminated the tenancy in the manner recognized by law; that is, surrendered to his landlords the possession which he had received from them. And this rule applies to any one in privity with the tenant. If we rightly construe the case of Cobb v. Robertson, above, these principles are there held applicable to the exact situation we have in the present case.

To sustain their contention that they were entitled to recover as innocent purchasers, defendants claimed under two chains of title emanating from the original grantee, George W. Brooks, as follows: Deed from George W. Brooks to E. O. Le Grande, dated February 24, 1841. This deed was proved by copy from the records of the judicial county of Menard, certified by the county clerk of Tyler county. Plaintiffs filed an affidavit of forgery to this deed. The original of this deed was not offered in evidence, and no affidavit of loss or inability to produce was filed, and no evidence offered attempting to excuse production of the original; neither was the certified copy filed among the papers of the case three days before the trial. The certified copy was objected to on the ground that no predicate was laid for the introduction of secondary evidence, and on the further ground that the deed was not acknowledged before an officer authorized to take acknowledgments, so as to bring the record thereof in the unconstitutional judicial county of Menard within the validating act of 1844 hereinafter referred to. The objections were overruled.

Le Grande, on February 7, 1852, conveyed the land to Mary E. Frazer as sole heir at law of David Brown, deceased, by instrument (omitting description) reading as follows:

"This indenture made this the 7th day of February, 1852, between Edwin O. Le Grande of the state and county aforesaid of the one part, and the heirs of David Brown, late of said county, deceased, of the other part, to wit, Mary E. Frazer, formerly Mary E. Brown, only heir of David Brown, and her husband, William Frazer, in right of his said wife, witnesseth: That for and in consideration of the sum of $5 to me in hand paid, the receipt whereof is hereby acknowledged, as well as

in consideration of the trust reposed in me, by the said David' Brown in his lifetime, by which I hold in trust for the benefit of the said David Brown his heirs and assigns the lands granted to the following persons as their head, which lands have been conveyed to me by the said David Brown, or procured by him to be conveyed to me, though absolutely in the deeds, but, in fact, in trust for the said David Brown, his heirs, and assigns, to wit: * * * Now in consideration of the premises, I, the said Edwin O. Le Grande, have this day bargained, sold, conveyed, released, and forever quitclaimed the aforesaid lands or the lands granted to the aforesaid persons as their headrights, so far as any title now is or ever has been vested in me, unto the heirs of the said David Brown, to wit, the said Mary E. Brown, née Mary E. Frazer, and her said' husband, William E. Frazer, so far as the title would vest in him by virtue of his intermarriage with the said Mary E. Brown, their heirs and assigns, and will forever warrant and defend from all persons claiming under him to the heirs of the said David Brown, his heirs or assigns. To have and to hold the same forever."

On May 6, 1856, Brooks and wife conveyed to Hugh B. Boston, by deed reading as follows: .

"That we, George W. Brooks and his wife, Eliza A. Brooks, of the county and state aforesaid, for and in consideration of the sum of $4,400 to us in hand paid, which we hereby acknowledge, have this day given, granted, bargained, sold, conveyed, and confirmed, and by these presents do give, grant, bargain, sell, and convey unto Hugh B. Boston, of the county of Gonzales state aforesaid, all the right, title, interest, and claim which we have in and to one league of land granted to me, said George W. Brooks, by the government of Mexico on the 22d day of August, A. D. 1835, and situated, lying, and being on the Neches river in Zavala's colony, and for a more particular description of said league of land reference is made to the original deed from the government of Mexico, now on file in the general land office of the state of Texas. To have and to hold unto him, the said H. B. Boston, his heirs and assigns, together with all and singular the rights, privileges and appurtenances to the same belonging or in any wise incident or appertaining, and we do hereby bind ourselves, our heirs, and legal representatives to warrant and defend all the right, title, and claim that we have in and to the above-described league of land."

On November 2, 1860, a judgment was rendered "that the plaintiff take nothing by his cause of action, and that defendants go hence without day" in a suit brought by Hugh B. Boston against W. B. Frazer and wife in the district court of Tyler county. This judgment was later affirmed by the Supreme Court.

It was agreed that defendants held under regular chain of title from Frazer and wife, and that in this chain of title was a deed from Thomas J. Word to John P. Irvin dated July 30, 1881. The testimony was undis-

255 S.W.—39

puted that Irvin, who was a resident of Chicago, Ill., paid the consideration expressed in his deed; which was the full value of the land at the time, and that he had no knowledge or notice of the outstanding title of plaintiffs, which was not recorded in Hardin county until 1891.

If the record shows a regular chain of title from the original grantee to the defendants, the trial court's judgment, therefore, must be sustained on their plea of innocent purchasers. .

[6] Considering first the defendants' chain of title, predicated upon the deed from Brooks to Boston, we have reached the conclusion that, aside from other questions raised by plaintiffs, which in the view we take become immaterial, defendants' title cannot be maintained because the deed from Brooks to Boston was a mere quitclaim, and will not support the plea of innocent purchaser.

While plaintiffs insist that this deed is a conveyance of the land itself, and ,not a mere conveyance of the grantor's title or chance of title, we think the holdings of the Supreme Court in the following cases conclusively establish the contrary: Cook v. Smith, 107 Tex. 119, 174 S. W. 1094, 3 A. L. R. 940; Threadgill v. Bickerstaff, 87 Tex. 520, 29 S. W. 757; Richardson v. Levi, 67. Tex. 359, 3 S. W. 444. Cook v. Smith is reported in 3 A. L. R. 940, appended to which, beginning at page 945, is a very complete note and citation and digest of authorities upon the "test of conveyance as quitclaim or otherwise." We think the deed in question is so clearly a quitclaim under the decisions of this state and other jurisdictions that it is only necessary to refer to the cases. Discussion of the question would be a mere repetition of or quotation from the above-cited decisions of our Supreme Court.

[7] It is earnestly insisted, however, that although it is now the established law of this state that one claiming under a quit-claim deed to himself or to his immediate grantor is not protected as an innocent purchaser, nevertheless such protection does extend to one where the quitclaim deed appears to have been to a remote grantor. 'It is further contended that, even if such quitclaim to a remote grantor would be sufficient to put all grantees thereunder upon notice of an outstanding title or defect in the title of the grantor in the quitclaim deed, such remote grantee is only required to use reasonable diligence to ascertain the existence of such outstanding title or defect, and upon exercising such diligence he is protected, if his inquiries are ineffectual. Under this latter contention it is claimed that Irvin did all the law required of him in the premises. .

The first of these contentions seems to be well established in the federal courts, and in

a number of other state courts. The same view appears to have been taken by the Court of Civil Appeals for the Second District in the case of Finch v. Trent, 3 Tex. Civ. App. 568, 22 S. W. 132, 24 S. W. 679, where some of the United States Supreme Court cases are cited. The question clearly was not necessary to the decision of that case as appears from the opinion on rehearing in 24 S. W. 679. Further discussion and authority bearing upon this question may be found in 29 L. R. A. 33; 23 A. and E. Enc. of Law (2d Ed.) 512; 13 Enc. of Ev. 917.

A careful review of the Texas Supreme Court cases upon this question will, we think, conclusively demonstrate that all the contentions of the defendants have been foreclosed adversely to those contentions by a long line of decisions. Rodgers v. Burchard, 34 Tex. 442, 7 Am. Rep. 283; Harrison v. Boring, 44 Tex. 255; Taylor v. Harrison, 47 Tex. 454, 26 Am. Rep. 304; Richardson v. Levi, above; Lumber Company v. Hancock, 70 Tex. 312, 7 S. W. 724; Garrett v. Christopher, 74 Tex. 453, 12 S. W. 67, 15 Am. St. Rep. 850; Threadgill v. Bickerstaff, above; White v. Frank, 91 Tex. 66, 40 S. W. 962; Cook v. Smith, above; Lumber Co. v. Lumber Co. (Tex. Civ. App.) 171 S. W. 537 (writ of error refused).

While expressions in some of these cases might indicate that the holder under such quitclaim deed is put merely upon inquiry, we are clear in the view that the decisions cited fairly establish the proposition that the holder of a title in which there appears, however remote, a quitclaim deed is prevented from asserting the defense of innocent purchaser as against an outstanding title or secret trust or equity existing at the time the quitclaim deed was executed. This rule, it seems to us, is so firmly established in our jurisprudence that it has become a rule of property, as will appear from the following quotation from Cook v. Smith:

"Furthermore, if the deed from Potts to Neff was only a quitclaim deed, Cook's title, deraigned through that deed and resting upon it, was not such, under the rule of decision in this state, as would sustain the defense of an innocent purchase of the property, though the deed from Neff to himself was a general warranty; for in such case the record, or apparent title to the property was clearly only such as Potts possessed, which, because of his previous conveyance to Smith, was no title at all."

In support of this quotation the above cases of Taylor v. Harrison, Garrett v. Christopher, and Threadgill v. Bickerstaff were cited. It is true that, in Cook v. Smith, the particular question under discussion was not essential to the decision of the case in view of the further holding of the Supreme Court that the deed from Potts to Neff was in fact a deed to the land itself and not a mere quitclaim. However, we regard the quotation as a clear statement of

the law as enunciated in the cases cited in support of it as well as other cases of the Supreme Court. It may be further noted in this connection that the very contentions here made by the defendants were made in the briefs for plaintiffs in error in Cook v. Smith, and leading cases in support thereof by the United States Supreme Court and some of the state courts were cited.

We therefore regard the question as settled in this state until such time as the legislative branch of the government may deem it in the interest of public policy to change the rule by statute. The instant case presents a state of facts which appeal strongly to one's natural sense of equity and justice. The plaintiffs and those under whom they claim appear to have withheld from the records of the county in which the land was situated the evidences of their title from 1836 to 1891, thus leaving the lands to be dealt with by other parties claiming under subsequent deeds from their original grantor. It would seem that the security of land titles would demand that one dealing with the title should be protected after so long a time from an outstanding title emanating shortly after the original grant was made and withheld from the record for nearly a half a century, the probability of discovery of the existence of which was left entirely to the barest chance or accident. But, in the state of the law as we now find it, under the long line of decisions of our Supreme Court, we feel that this question is one which addresses itself solely to the legislative and not to the judicial branch of the government for correction. We held, therefore, that the defendants cannot assert title as innocent purchasers under the deed from Brooks to Boston.

[8, 9] Passing to the question of the validity of the Menard county records, it is urged that the deed from Brooks to Le Grande was not properly recorded in Menard county, because not acknowledged before an officer authorized by law to take acknowledgments so as to bring it within the validating act of 1844. The only authority upon this subject cited by plaintiffs is the case of Houston Oil Co. v. Goodrich, 226 Fed. 434, 141 C. C. A. 264, from which we quote:

"It seems that the court did not err in excluding the evidence offered as a record of a deed of Charles A. Felder to William A. Daniels, which was a link in the chain of the record title relied on by the defendants. The book containing the offered copy of the instrument was one which had been used for recording conveyances in the pseudo county or district of Menard, which never had any legal existence because of the constitutional invalidity of the statute which undertook to create it. The only statute to which we have been referred as having the effect of giving legal validity to such a record is an act of January 6, 1844 (2 Gammel's Early Laws of Texas, p. 922), which by its express terms is confined in its opera-

tion to 'deeds, and other instruments of writing, which have been duly proven before the proper officers of such district, or other legal officers.' The instrument in question did not purport to have been so proven; the acknowledgment of it having been taken before a notary public, an officer who at the time the deed purported to have been made did not have authority to take acknowledgments of conveyances of land."

In connection with this case, counsel for defendants state:

"In the Goodrich Case, there had been presented to the trial judge a certificate from the office of the secretary of state, which it was claimed was sufficient to show that William Myers at the date of the deed being considered in the Goodrich Case (June 10, 1839) was not a notary public of Jasper county. Afterwards an examination of the records in the office of the secretary of state showed that he was a notary public at that time, but that data was not on hand at the trial. The trial court, therefore, found that William Myers, at the date of the deed from Felder to Daniels, was not a notary public, hence the Circuit Court of Appeals held that the act of January 6, 1844, hereinbefore referred to, only validated such instruments spread upon the Menard records as had been properly acknowledged before a proper officer."

The language above quoted from the Circuit Court of Appeals would seem to indicate that a notary public was not authorized by law to take acknowledgments of deeds; and this would appear to be correct as applied to an instrument acknowledged on June 10, 1839, because the Act of January 19, 1839 (Laws 1839, p. 52), which repealed all previous laws in conflict with it required proof of acknowledgment to be made before some county court or chief justice of the same, or before the clerk, in whose office such instrument was to be recorded. See in this connection McCelvey v. Cryer, 8 Tex. Civ. App. 437, 28 S. W. 691. The Act of February 5, 1840 (Laws 1839-40, p. 153) however, authorized the admission to record of any act of conveyance acknowledged before a notary public of a county, as well as other officers named, and from the date of that act to the present time it has always been competent for notaries to take acknowledgments to deeds. The instrument now before us was acknowledged before a notary on February 24, 1841, and was therefore properly subject to registration. That the records of the judicial county of Menard were properly validated, if validation were necessary, we think does not admit of serious question. A brief history of the legislation upon this subject may not be amiss. In 1841 the Congress of the Republic created a number of counties or districts for judicial purposes out of the territories of existing counties. Among them was the judicial county of Menard created out of a part of Liberty county. Some time

in 1842 (the exact date does not appear from the reports) the Supreme Court in the case of Stockton v. Montgomery, Dallam Dig. 473, held that these acts were unconstitutional, in that the counties thus created were not given a representative in Congress. The concluding paragraph of this opinion reads:

"If the effect of the decision of this case should be to repudiate, as unconstitutional, the county of Ward, I am prepared to say, from a principle of necessity, consonant with sound practical sense and distributive justice, however variant from an exquisite chain of sophistries that might be elaborated, that all the judicial and ministerial action, had in the territory under the seeming sanction of the Constitution and the forms of law, is precisely as valid de facto, as if it could have received and had actually received full and separate representation in Congress."

Whether the judicial counties thus organized were counties de facto as strongly intimated in the above quotation was not left for judicial determination. On July 18, 1842, the Congress validated all certificates and orders for surveys, etc., executed by the boards of land commissioners or district courts for the several judicial counties. 2 Gammel's Laws, 811. On January 6, 1844 (Laws 1844, p. 10), the Congress passed an act with reference to the records of Menard county, which, among other things, provided "that all deeds, and other instruments of writing, which have been duly proven before the proper officers of justice of such districts, or other legal officers, and filed for record, with the clerk of the county court of said districts, shall have, from the time thus filed, the same legal validity and effect as if duly proven and recorded in the office of the clerk of the county court of Liberty county," etc. The act further required the former clerk of Menard county to deliver to the county clerk of Liberty county the Menard county records. On April 3, 1846, Tyler county was created with boundaries the same or substantially the same as those of the prior county or district of Menard. 2 Gammel's Laws, p. 1348. It will thus be seen that whatever invalidity may have originally attached to these records was cured by legislation, and that a properly authenticated copy from the records of Tyler county of an instrument filed in Menard county was given the same force and effect as a certified copy from the records of a legally constituted county.

Whether the record of an instrument acknowledged before a notary public under the act of 1839 and recorded in Menard county was ever validated by legislation is not necessary for us now to decide. In this connection, however, the Act of February 5, 1841 (Paschal's Dig. art. 4977), Act of February 9, 1860 (P. D. art. 5021), Butler v. Dunagan, 19 Tex. 559, Waters v. Spofford,

58 Tex. 115, McCelvey v. Cryer, above, and the act of 1905 might be cited.

[10] The certified copy from the records of Menard county was therefore not subject to the objection under consideration. However, in order that it might be introduced as secondary evidence of the original instrument which was not produced, as against an affidavit of forgery, it was essential that article 3700, R. S., be complied with as regards laying the proper predicate for secondary evidence. Emory v. Bailey, 111 Tex. 337, 234 S. W. 660, 18 A. L. R. 906.

We think, therefore, that the trial court committed error in admitting the certified copy in evidence over the objection of plaintiffs that proper predicate for the introduction of secondary evidence had not been laid.

[11] It is further contended by plaintiffs in connection with the Le Grande chain of title that the deed from the latter to Mary E. Frazer was a quitclaim deed, and would not support the plea of innocent purchaser. With this conclusion we cannot agree. The granting clause of this instrument clearly shows, we think, that it was the intention of the grantor to convey the lands, and not merely his title or chance of title. The consideration for the deed is recited to be the fact that the grantor was merely a trustee for Mrs. Frazer's father, and never had any title in the lands further than that he held the legal title in trust for him. The language in the granting clause "so far as any title now is or ever has been vested in me" does not in any way detract, we think, from the deed as a conveyance of the land itself. If the declarations in the deed are true, then a conveyance from Le Grande to David Brown or his heirs would not be essential to show title in the latter. They could recover the land from Le Grande by showing those facts. The deed merely operated to establish those facts by the holder of the legal title, and passed that legal title to the holders of the beneficial or equitable title. Clearly we think the purpose and intent of the deed was to convey the land, and not a mere chance of title.

We conclude that the judgments of the district court and Court of Civil Appeals should be reversed, and the cause remanded to the former for a new trial.

On Motion for Rehearing.

[12] Plaintiffs in error in their motion for rehearing assail our holding that the certified copy of the notarial act of sale from Thomas Sloo, Jr., to James W. Byrne was admissible in evidence, urging, among other contentions, that since the act of sale was executed before a notary public of Louisiana in April, 1839, when, under the laws of Texas, a notary was not authorized to take acknowledgments to deeds, the notarial act was not admissible to record at the time it was made, and was never validated by subsequent legislation. This particular contention was not discussed in our original opinion, and we deem it of sufficient importance to warrant a record of our views.

As pointed out in our original opinion, the act of January 19, 1839 (2 Gammel's Laws, p. 52), which by its terms repealed all laws contrary to or conflicting with it, did not authorize the recording of instruments acknowledged before notaries public. Prior to that time it was generally held that notaries could take acknowledgments to deeds, although the statutes upon the subject may not have in express terms so provided. The statutory enactments in this regard were: Acts of 1836 (P. D. art. 4678); June 12, 1837 (P. D. art. 4680); November 16, 1837 (P. D. art. 4681); 1838, p. 10. By section 5 of the Act of February 5, 1840 (2 Gammel's Laws, p. 328), clerks were required to record all deeds and other instruments "upon the certificate of some district judge or chief justice, or notary public of a county, with the seal of his office thereunto annexed, that such acknowledgment was made, or the execution of the instrument proven as required above." Section 20 of the Act of February 5, 1841 (2 Gammel's Laws, p. 632; P. D. art. 4977), provided that deeds and other instruments required or permitted to be recorded, "and which shall have been heretofore registered, shall, from the passage of this act, be held to have been duly registered, with the full effects and consequences of the existing laws: Provided, the same shall have been acknowledged by the grantor or grantors, maker or makers, before any chief justice of the county court, or before any notary public, or before the clerk of the county court in whose office such record is proposed to be made, or proved before such officer by one or more of the subscribing witnesses, and certified by such officer; any obscurity or conflict in the existing laws, to the contrary notwithstanding."

There are a number of curative statutes passed subsequent to the act of 1841, but their application to the question in hand is doubtful and we will not refer to them. It is to be observed that the act of 1841 in terms appears to apply only to such instruments as "shall have been heretofore registered." That act came up for consideration in the case of Butler v. Dunagan, 19 Tex. 559, and the court, speaking through Judge Wheeler, held:

"If it had been recorded upon that acknowledgment, before the act of 1841, it would have come clearly within the provision of the twentieth section of the act. Hart. Dig. art. 2776. In terms, the twenty-first section applies to instruments thereafter to be made and recorded; but we do not think a literal construction would give effect to the act according to its spirit and intention. If, when presented for record, the deed had been duly acknowledged before

the proper officer, it could make no difference whether the acknowledgment was made before or after the passage of the act. If acknowledged before, it could not have been intended that the acknowledgment should be again repeated. The act was intended to remove objections to the sufficiency of the registry of deeds, upon such acknowledgments, and to provide for their recording in future. It was a healing and enabling statute, and ought to be construed liberally. To exclude this instrument from its operation, because acknowledged before its passage, where, if before recorded upon the same acknowledgment, it would have been within its operation, would be an extremely narrow and strict construction, and such an one as, in our opinion, would not be in harmony with the legislative intention, and the manifest spirit and intention of the law. We think, therefore, the instrument was sufficiently authenticated to admit it to record."

That holding was approved in Waters v. Spofford, 58 Tex. 115, and made the basis for the decision reached. The holding in Butler v. Dunagan was questioned by the Court of Civil Appeals in McCelvey v. Cryer, 8 Tex. Civ. App. 437, 28 S. W. 691, but the question was not necessary to the decision of the case. We have found no decision by the Supreme Court which questions the holding in Butler v. Dunagan, but on the contrary there are a number of cases construing other curative statutes which approve the doctrine of liberality of construction therein laid down. Land Co. v. Williams, 48 Tex. 606; Pasture Co. v. Preston, 65 Tex. 458; Baker v. Westcott, 73 Tex. 131, 11 S. W. 157.

Section 5 of the Act of February 5, 1840, was intended to apply, we think, to instruments theretofore as well as thereafter acknowledged. That act would no doubt be sufficient as a validating act for the instrument in question were it not for the fact that it uses the expression "notary public of a county." One might plausibly urge that this expression was meant to apply only to notaries public of counties in the Republic of Texas; and it may be that this is the proper construction to give to the language; although it might also be urged with much force that, since it was quite common at the time the act was passed for conveyances of Texas realty to be executed before notaries in Louisiana, the act was intended to validate all such notarial acts.

The act of 1840 aside, we think it quite clear that, under the construction given in Butler v. Dunagan to the act of 1841, the acknowledgment of a deed theretofore taken before a notary public within or without the Republic was authorized to be admitted to record. The act in express terms validates all previous records of such instruments and, unless restricted to its literal interpretation, it applies with equal force to such instruments theretofore executed and acknowledged, but not up to that time placed of record. Any other holding would be a marked departure from the spirit of liberality evidenced in the attempts to validate all technical deviations from the letter of the law in the acknowledgment and record of instruments executed in early times, as expressed both in legislative enactments and in the construction of those enactments by the Supreme Court.

If the original instrument was entitled to record, then it clearly follows under the holding in our original opinion that a certified copy from the notarial records of Louisiana duly authenticated as required by federal statute, would also be entitled to record, and, if entitled to record, it was admissible in evidence without proof of the original.

We have given careful consideration to the other grounds for the motion, and have reached the conclusion that they are all properly disposed of in our original opinion.

We conclude that the motion for rehearing should be overruled.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.