Anna SLATTERY et al., Appellants,

v.

Nell B. ADAMS et al., Appellees.

No. 4884.

Court of Civil Appeals of Texas.

Beaumont.

Nov. 18, 1954.

Rehearing Denied April 20, 1955.

446

Orgain, Bell & Tucker, Beaumont, for appellants.

Bradford Pickett, Frank K. Dougharty, Hightower & Wheat, C. B. Cain, Liberty, for appellees.

WALKER, Justice.

The action is in trespass to try title, to recover one of the three Conrad Eigeneaur Surveys in Liberty County, being Abstract No. 186, Patent No. 559, Volume 15, less, however, 160 acres in the southwest corner of this survey which was formerly occupied and claimed by Nevil Doucette. The defendants also plead a cross-action in trespass to try title for the same land.

The cause was tried to the court with a jury, and the court instructed the jury to return a verdict for the plaintiffs and some persons who were cross-defendants, and then rendered judgment awarding the plaintiffs and said cross-defendants the title to and possession of the land in suit and denying the defendants any relief on their cross-action. From this judgment the defendants have appealed.

The appellees are referred to hereinafter as the plaintiffs, although, as stated, some of them were cross-defendants.

The survey in suit was patented to the heirs of Conrad Eigeneaur, deceased, on June 30, 1862, by virtue of Certificate No. 555, which was issued to the said heirs by the Board of Land Commissioners of Harrisburg County on June 7, 1838. Plaintiffs claim to have acquired the title of the aforesaid heirs in several different ways. The defendants contend that the plaintiffs failed to prove title and also claim that they, the said defendants, have acquired the title for themselves. It is unnecessary at this point to identify the plaintiffs or to state their claims of title. The defendants on trial, and the appellants here, are Anna Slattery and Nora Slattery, daughters of Thomas and Kate Slattery. The parents of the defendants died before this suit was filed. Some of the claims asserted by defendants devolved upon them by inheritance from their parents, in part directly and in part through their sister, Mayme Slattery, who died after this suit was filed; but they also claim title under their own adverse possession and that of their sister Mayme.

Opinion

Among other claims, plaintiffs assert title under a group of persons who, themselves, claimed that a series of inheritances had vested them with the title of a person who, they said, was the sole heir of Conrad Eigenauer, and plaintiffs identify Conrad Eigenauer with Conrad Eigeneaur. According to these people, Conrad Eigenauer's real name was Conrad Eichenauer and his brother was his heir. The brother's name was said to be Christoph Eichenauer and his title was said to have been inherited by his wife and from her, by the group of people mentioned. This group, or a large number of them, gave W. Von Rosenberg a pow-

er of attorney which is in evidence, and Von Rosenberg, acting as agent for these and others, had a transaction with one Johnson involving a deed to and contract with Johnson, and later on he had a transaction with a Wm. Fuchs, and plaintiffs proved a chain of instruments which, they say, runs back to these transactions of Von Rosenberg's and vests them with the title of Von Rosenberg's principals, both those named in the power of attorney and in his deed to Johnson.

Points 1, 2, 3 and 4 attack the evidence which the plaintiffs rely on to prove this claim as to the identity of Conrad Eigeneaur's heirs. It is plaintiffs' contention that recitations in ancient instruments and in recorded papers, together with circumstances in evidence, proved this identity as a matter of law, but they also invoke the doctrine of idem sonans. The defendants argue to the contrary, saying first that the doctrine of idem sonans is not applicable and that the evidence does not support the claim of heirship made by plaintiffs, and next, that if there is evidence to that effect it only made an issue for the jury.

We note that plaintiffs have made some use of the power of attorney dated April 10, 1902 from Fredrich Carl Fuchs, et al., to J. V. Tackaberry. This instrument was excluded by the trial court, and is not in evidence and so has no bearing on these points.

Questions first to be considered pertain to the materiality, competency and effect of some of the evidence relevant to these points of error.

Adolphus Sterne, as administrator of Conrad Eigenauer, stated in his report of September 24, 1849, that he had "written at various times to the supposed relatives of said Eigenauer who are either in Wurtemburg, or the Dutchy of Nassau in Germany, representing said estate, but never received an answer; that within the last four months your deponent has laid the matter before the Consul General of Wurtemburg, residing at Baltimore, for the purpose of ascertaining who are the heirs of said Eigenauer and to know what disposition they may wish to make of the property now in the hands of your deponent." It is our conclusion, stated in our supplemental findings, that Sterne's decedent was the colonist named in the basic certificate.

But what does the statement prove? Regardless of the competency of this statement as evidence, it shows: Directly, only that Sterne had written to certain persons and had received no answer and that he had requested an officer to find out who were the heirs. Impliedly, that he did not know who the heirs were and further, that persons whom he supposed to be relatives of the decedent lived in certain German principalities. Sterne's supposition is not evidence. Can it be implied that the decedent was himself a German? The statement suggests that Sterne had been informed that his decedent's heirs were Germans, and of course his report reflects somebody's declarations; and his information was enough to cause Sterne to initiate a search. However, the source and nature of Sterne's information and these declarations are not otherwise apparent. If competent, the statement quoted is only direct evidence of what Sterne did.

■ The recitations concerning pedigree, showing of heirship and related matters, which appear in the power of attorney from Margarethe Laemmer, et al., to Von Rosenberg were not competent under Article 3597a, Vernon's Ann.Civ.Tex.St., because this statute applied only to instruments recorded in the deed records of the county in which the land in suit is situated and Von Rosenberg's power of attorney was recorded in a different record of that county, namely, the power of attorney records.

■ The recital in Von Rosenberg's deed, as agent, to Johnson that the grantors were "the heirs of Conrad Eigenauer, deceased", was not competent under Article 3597a, for a different reason. This statute makes admissible "the statement of facts concerning any family history and showing who were the legal heirs of any deceased person", and the statement in the deed is a conclusion, not a statement of fact. The recitals in Von Ros-

enberg's power of attorney, which had been given to him by most of the grantors named in his deed, show how much of a conclusion this statement of heirship contained in the deed really was and, incidentally, how much of a conclusion such a statement in a recorded paper can be. According to these recitals the name of the decedent in the power of attorney was similar to that of Sterne's decedent but the spelling was slightly different (Eiche—instead of Eige) and none of the principals named in the power of attorney was related to the decedent named therein. Their claim was at the bottom of an extended chain, running from decedent to his brother and from this man to his widow and from this woman to these principals. This declaration may, perhaps, be distinguished from that in Gramm v. Coffield, Tex.Civ.App., 116 S.W.2d 1089, where names were similar and there was a declaration of blood relationship. We have referred to the record in Sun Pipe Line Co. v. Wood, Tex.Civ.App., 129 S.W.2d 704, and that case is not in point on the facts. We have found no other decision pertaining to the form of declaration admissible under Article 3597a.

■ The recitals in the power of attorney and in the deed were not competent as statements of pedigree within that exception to the hearsay rule because it appears from these recitals that descent had been cast before the recitals were made and that the recitals were self-serving. Byers v. Wallace, 87 Tex. 503, 28 S.W. 1056, 29 S.W. 760; McCormick & Ray, Sec. 601.

■ The recitals in the power of attorney and in the deed also were not competent as statements in ancient documents within the exception to the hearsay rule discussed in Sections 612 to 617, inclusive, of McCormick & Ray, at least without confirmatory circumstances. To hold otherwise would be inconsistent with the policy which is expressed in the rule cited immediately above which excludes declarations of pedigree after descent has been cast on the declarant, and it is to be noted in connection with this that statements of pedigree are not admissible within the pedigree ex-

ception to the hearsay rule until the declarant has become unavailable. See: McCormick & Ray, Sec. 599. It would seem, then, that such a self-serving declaration ought not to be admitted as an ancient statement without confirmatory circumstances merely because it is thirty or more years old instead of less, and it has been so held. McCoy v. Pease, 17 Tex.Civ.App. 303, 42 S.W. 659. The language in Watkins v. Smith, 91 Tex. 589, at page 591, 45 S.W. 560, and in Maxson v. Jennings, 48 S.W. 781, at page 785, indicates a similar conclusion. Compare Ardion v. Cobb, Tex. Civ.App., 136 S.W. 271, a later decision by the Court of Civil Appeals which decided McCoy v. Pease. Our conclusion is not inconsistent with decisions such as Howard v. Russell, 75 Tex. 171, at page 177, 12 S.W. 525, and Wiener v. Zweib, Tex.Civ.App., 128 S.W. 699, affirmed at 105 Tex. 262, 141 S.W. 771, 147 S.W. 867, because the policy affecting our conclusion was not applicable to those cases. For the admissibility of these recitals as ancient statements the plaintiffs cite Magee v. Paul, 110 Tex. 470, 221 S.W. 254; Bendy v. W. T. Carter & Bro., Tex.Com.App., 269 S.W. 1037; Moses v. Chapman, Tex.Civ.App., 280 S.W. 911 and Bruni v. Vidaurri, 140 Tex. 138, 166 S.W.2d 81, but none of these decisions is in point. The one most emphasized is Moses v. Chapman, but this is simply the sort of case excepted in Watkins v. Smith, 91 Tex. 589, 45 S.W. 560. Of the notarial acts of 1826 and 1829 considered in Bruni v. Vidaurri it was only held that these acts proved the facts recited and these facts were that certain declarations had been made. Those declarations were not of the kind now under discussion. However, the first three of these decisions do have some bearing on the matter which is now to be discussed.

■ We hold however that the recital of heirship in the deed to Johnson was admissible, not to prove the truth of the conclusion stated, but, it being a claim of heirship, as a circumstance to be considered with other evidence in determining whether the grantors really were the heirs they claimed to be. It was on this ground

that the declarations considered in Magee v. Paul were held admissible, and it seems to us that this is the basis of the holdings now to be mentioned. In Watkins v. Smith, 91 Tex. 589, 45 S.W. 560, 561, there were recitals of heirship in deeds but no other proof of the heirship and the court held of these that "recitals in a deed are evidence against the parties to such deed and their privies, but not against strangers." The court then mentioned a possible exception in these words: "Whether the facts that a deed has been made by a grantor, in which he purports to convey as heir of another; that the grantee has taken possession of the land, used and cultivated it for many years; and that during this time his right has remained unchallenged by any adverse claimant,—would have sufficient probative force to authorize a finding that the grantor was the heir, as recited in the conveyance, is a question not raised in this case." Subsequently, the Galveston Court of Civil Appeals applied this exception in Maxson v. Jennings, 19 Tex.Civ.App. 700, 48 S.W. 781, and still later, the Texarkana Court of Civil Appeals also applied the exception in Moses v. Chapman, 280 S.W. 911. In both Maxson v. Jennings and Moses v. Chapman the declaration of heirship was confirmed by the kind of circumstances referred to in Watkins v. Smith. We note that in the quotation made by plaintiffs from Bendy v. W. T. Carter & Bro. as support for admissibility of the recitals in question as statements in ancient documents, confirmation of the recitals by the absence of adverse claim for a long time is referred to as a ground for admission of some declarations which were partly self-serving and conclusions.

█ The recital of heirship in the deed being competent for the purpose stated, then the recitals in the power of attorney concerning heirship were competent in connection with it, at least as regards the persons who were parties to both instruments, since the recitals in the power explain the claim made by these parties in the deed. We note however, that the parties make no difference between the grantors in John-

son's deed who were not parties to the power and those grantors who were.

█ In view of these conclusions the only possible use for the declarations of heirship and pedigree in question is under the exception mentioned in Watkins v. Smith, and we are now brought to the question, whether this exception is applicable to the evidence in this case and whether an issue for the jury was raised under it. We hold that the exception is not applicable and that no issue was raised for the jury concerning the matter of heirship in question. Our reasons are the following:

The evidence concerning the administration of the estate of Conrad Eigenauer shows with sufficient certainty that the decedent's name was really Eigenauer instead of Eigeneaur and that the spelling Eigeneaur used in the basic certificate and later in the patent was wrong.

As a result of this conclusion the assessment of the survey to "Conrad Eigeneaur by A. W. B. Thompson, Agt." for taxes for 1867, the first assessment made, is of little, if any, significance.

However, two adverse claims of title rose up before the principals named in the power of attorney to Von Rosenberg and in Von Rosenberg's deed to Johnson began to assert title as heirs. The power of attorney was dated April 11, 1880, and the deed was dated March 1, 1895. One of these claims adverse to that asserted by Von Rosenberg's principals was that of the Preacher group and these people claim under A. N. B. Tompkins. The land was assessed to Tompkins for 1868, 1870 and 1871, and Charles A. Sterne made a deed to Tompkins dated September 11, 1871 which seems to have involved the land. After Tompkins' name left the assessment rolls there is no evidence that this Preacher claim was actively asserted until Mr. Pickett was employed in 1903 to represent them. In the meantime, the claim under Von Rosenberg's power of attorney and deed had come into operation in 1895 and was asserted for two or more years and then, so far as the evidence shows, sub-

sided until in 1901. After his employment in 1903 Mr. Pickett immediately began to assert the Preacher claim again, in hostility to all others, and he continued to do so. Thus he began an active possession which with interruptions continued until in 1941 when Gaston Lloyd, a tenant, abandoned his possession. Mr. Pickett and his clients performed other acts of dominion over the land, some specifically directed against the claim of title under Von Rosenberg. Thus Stein, who asserted title under conveyances to the claim of title under Von Rosenberg, had, acting through a local attorney, initiated a possession of the land in 1909, and the testimony about the duration and continuity of this possession is in conflict. Mr. Dabney, Stein's lawyer, said that this possession continued for "a little over five years" but Mr. Pickett said that it was much shorter and was not continuous. Further, Mr. Pickett said that he destroyed this possession by forcible detainer proceedings—directed, perhaps, at a possession on the middle Eigeneaur Survey, but Stein claimed both surveys under the same title and Mr. Pickett's success gainst the middle survey was equivalent to a success against the survey in suit. In 1918 Stein took a judgment against the unknown heirs of Conrad Eigeneaur, which is discussed hereinafter, and shortly afterward he made the Preacher group parties defendant to his suit against Thompson-Ford Lumber Company to which the Preacher group had sold timber on the land, and by an agreed judgment dated November 5, 1923, the claims of the Preacher group and of Stein were amalgamated and the parties were made joint owners. Stein was awarded 200 acres undivided and the Preacher group, 348 acres undivided, of the land in suit.

The other claim hostile to that asserted by Von Rosenberg's principals was that now asserted by the defendants, which the defendants trace back through their parents to one Simpson, to whom an assessment was made for 1872. There is evidence that the defendants' father Thomas Slattery established a possession on the land in 1886 or 1887 which continued for several years, and that he asserted claim to the land for a much longer period, the deed to him being dated May 28, 1877. An assessment for taxes was made to him for 1877 and the last assessment made to this claim of title before the defendants renewed their claim in 1919 was for the year, 1893, and after that the defendants' claim subsided until 1919; then it was renewed by a re-entry upon the land and it has been continuously asserted since. During all of the period ending with 1893 the claim of title asserted by Von Rosenberg's principals was quiescent and it did not come into active assertion *as regards the land in suit* until 1895, with the filing for record of Von Rosenberg's power of attorney and with the deed to Johnson, a time when both of the other adverse claims of title were quiet.

There is some evidence of activity by Johnson. For instance, assessments were made to him for 1895 and 1896, but only for those two years; and there is no evidence that he ever had possession of the land. And he made a deed to Doucette dated March 14, 1895, which, plaintiffs say, applied to the southwest part of the survey in suit. Johnson lost his title to Fuchs, to whom Von Rosenberg had purportedly transferred various rights, and Fuchs made a deed to Jones and then, with Jones, made a deed to Stein. Von Rosenberg, Fuchs and Jones never appeared on the tax rolls and there is no evidence that they ever paid taxes on or had possession of the land. Stein's deed was made in 1909 and after he came into this claim it was actively asserted, as we have already shown. However, the first possession proved under it was after Stein's deed, beginning in 1909. This was more than 70 years after the basic certificate was issued and was nearly 30 years after the claim first came into view with the power of attorney to Von Rosenberg. As we have stated, Mr. Pickett's testimony is that this possession was broken up by him, asserting the claim of the Preacher group, after it had lasted, according to Dabney, "a little over five years" at the most; and persons claiming under Von

Rosenberg had no possession afterward until the Preacher group became their co-tenants.

While on the evidence before us, no person (unless the principal for whom "A. W. B. Thompson" made the rendition for 1867 did so) has come forward claiming to be an heir of Conrad Eigenauer or Eigeneaur except the persons named in the power of attorney to Von Rosenberg and in the deed to Johnson (we note again that the power of attorney to Tackaberry is not in evidence), nevertheless the claim of title made by the Preacher heirs and the claim of title made by the defendants were adverse to the claims of these other persons and were long and actively asserted by possession and otherwise *before* and *after* the claims of and claims under Von Rosenberg's principals were asserted, and the claim under Von Rosenberg had little possession, most of it being on paper. The proof does not meet the requirements made in Watkins v. Smith, Maxson v. Jennings and Moses v. Chapman. To hold that it does would extend the exception much further than the language of the Supreme Court in Watkins v. Smith indicates that it should be.

Sterne's declarations in his report of September 24, 1839, of what he had done to identify and communicate with his decedent's heirs do not, when considered as circumstances, affect this conclusion nor would the depositions of Charles Sterne and Maria Seidensticker, filed in Stein v. Thompson-Ford Lumber Company, which we have not discussed. However, the plaintiffs were not *bound* in any way by these depositions. The defendants, who introduced this evidence were not parties to that suit and do not claim title under the judgment in it. There is nothing to show that the depositions were ever put in evidence in the Thompson-Ford suit; instead, the judgment rendered in that suit was based on an agreement. Stein, whose interest is now held by some of the plaintiffs and whose claims of title are now owned by these plaintiffs, caused the depositions to be taken but this is not enough to make them admissible in defendants' behalf in this suit. Whether these depositions are admissible on any other ground for any purpose is a question which we do not decide.

The doctrine of idem sonans does not help the contentions of the plaintiffs respecting this group of points.

Of Points 1, 2, 3 and 4, we sustain Point 2.

Points 5 and 6 attack certain elements in the chain of papers under which plaintiffs claim title under the principals of Von Rosenberg, whose claim as heirs is discussed above, and to these is related Point 33. The conclusions just stated make these points immaterial but we will discuss the merits of these points since we are ordering a new trial. Defendants' arguments under these three points make no attack on: (1) Von Rosenberg's deed of March 1, 1895 (as agent), to Johnson, conveying this survey in suit and the other two Eigeneaur surveys and reserving a vendor's lien to secure the price; (2) Von Rosenberg's contract with Johnson of the same date, but recorded much later than was the deed, whereby Johnson agreed, among other things, to hold possession for three years and then to convey to Von Rosenberg three-fourths of the land, Von Rosenberg agreeing in return to then surrender Johnson's note for the price; (3) Von Rosenberg's transfer of November 30, 1901, to "Wm. Fuchs, Trustee, the benefit" of this contract, Johnson's notes for the price, and all of his, Von Rosenberg's rights in and the superior title to the land described in the deed and contract. We accordingly infer that defendants agree that these transactions were legally effective and that Von Rosenberg's transfer to Fuchs vested in the latter the interests it purported to transfer and convey, subject to the contentions discussed under these points. By a consent judgment dated August 19, 1902, the District Court of Liberty County adjudged to Wm. Fuchs, as plaintiff and in his individual capacity, the land previously conveyed to Johnson, less, however, certain exceptions, and the contract of March 1, 1895, and Johnson's notes for the price were annulled. Later, Wm. Fuchs, acting as an individual and not as a trustee, conveyed to Ira P.

Jones an interest in the land adjudged to him and still later, by a deed dated June 1, 1909, Wm. Fuchs, again acting as an individual, together with Jones, purported to convey this land to I. A. Stein. The description in Stein's deed is materially different from that used in the prior documents.

The subject matter of Point 33 is the exclusion of a power of attorney, dated April 10, 1902, to J. V. Tackaberry by persons who declared themselves to be the heirs of "Conrad Eigenauer" and who, in substance, assert the same basic claim of title as that previously asserted by Von Rosenberg's principals. Tackaberry's power of attorney purports to revoke previous contracts or powers of attorney, but it refers to Von Rosenberg (describing him as dead) and indicates that Tackaberry was employed as Von Rosenberg's successor. The revocatory clause is not inconsistent with transactions entered into by Von Rosenberg with authority and without authority such a transaction would be void anyhow. This power of attorney was given subsequent to Von Rosenberg's transfer to "Wm. Fuchs, Trustee." Defendants also offered a deed by Tackaberry based on this power of attorney, and a subsequent deed by his grantee; and all three documents were excluded. The purpose of the defendants in offering these documents was to show an outstanding title against the plaintiffs' claim under the Laemmer power of attorney to Von Rosenberg. They say that the vendor's superior title and the other rights retained by Von Rosenberg in his transaction with Johnson, which have been indicated above, were the property in equity, of Von Rosenberg's principals and that Fuchs took as trustee for those people and that Fuchs' later conveyances as an individual were ineffective against those people so that the power of attorney to Tackaberry was effective, as were other deeds based on this power.

If the defendants mean to imply that Fuchs was acting as trustee for Von Rosenberg's principals, this contention is not proved. For the nature of Fuchs' trust and the identity of his beneficiaries, if trust and beneficiaries there were, are not shown by the evidence.

Fuchs, then, if he is to be held as trustee for Von Rosenberg's principals, could only be a constructive trustee, by virtue of a breach of trust by Von Rosenberg, and we are inclined to think that the evidence does not go so far. However, if it does, the rights of Von Rosenberg's principals are not material because the defendants do not connect themselves with these rights. Assuming the effectiveness of Von Rosenberg's transaction with Johnson and of his later transfer to Fuchs, the revocatory clause in Tackaberry's power of attorney could have had no effect on either, and the judgment of August 19, 1902 in behalf of Fuchs against Johnson vested Fuchs with legal title in fee simple (perhaps in trust or subject to equitable remedial rights) and if Fuchs' deeds to Jones and Stein were good, this title would have passed to Stein under these deeds. Such a title, whether in trust or not, is enough to support this suit which, as we have stated, is in trespass to try title, unless the suit is against one claiming under the trust or equitable remedial rights, and the defendants are not so claiming.

It is to be noted, in considering the effects of Fuchs' deed, that Von Rosenberg's conveyance of title to Fuchs was to the latter's "heirs and assigns" and from the word "assigns" a power of sale has sometimes been implied. The deed considered in Moore v. City of Waco, cited by the plaintiffs, does not contain these words. However, the existence or not of a power of sale (in the sense of authority) is immaterial; we are only concerned with the question, whether Fuchs had power to transfer the legal title he claimed, and we think he did. See Olcott v. Gabert, 86 Tex. 121, 23 S.W. 985. Concerning the right of one having Fuchs' title to maintain trespass to try title, see that decision and, also, see: Shields v. Hunt, 45 Tex. 424; Fitch v. Boyer, 51 Tex. 336; Tapp v. Corey, 64 Tex. 594; Pure Oil Co. v. Tunnell, 126 Tex. 57, 86 S.W.2d 207; Welder v. McComb, 10 Tex.Civ.App. 85, 30 S.W. 822; Settegast v. O'Donnell, 16 Tex.Civ.App. 56, 41 S.W.

84; Lewis v. Brown, 39 Tex.Civ.App: 139, 87 S.W. 704; Dean v. Jagoe, 46 Tex.Civ. App. 389, 103 S.W. 195.

The fact that Tackaberry's deed may have conveyed to Davis the equitable rights of his and of Von Rosenberg's principals is thus immaterial. And since we have held that the heirship claimed by Von Rosenberg's principals was not proved, this power of attorney is immaterial as respects the argument made at pp. 32 and 33 of defendants' second brief.

■ The arguments by the defendants which we have mentioned are overruled and thus we overrule Points 33 and 5. We now take up an argument made under Point 6. The substance of this is that Fuchs could convey only what he got; that in the judgment against Johnson, the survey in suit was awarded to Fuchs with the exception therefrom of two 160-acre tracts (which were plainly segregated tracts and not undivided interests), one described as conveyed to Moores by Johnson and one described as recovered by McManus from "Johnson, et al."; that the evidence does not locate these excepted tracts; and that without such evidence a judgment for plaintiffs based on Fuchs' judgment cannot be framed. This argument, and Point 6, are sustained. There are three Eigeneaur surveys in the county of suit, all located under the same certificate, and the survey in suit is the northernmost. Plaintiffs apparently contend that the descriptions of the survey in suit and of the southernmost of the three Eigeneaur surveys which are stated in Fuchs' judgment contain latent ambiguities, and that by resolution of these ambiguities the Moores and McManus tracts are put in the southernmost survey where, the plaintiffs say, these tracts belong. We note that in Stein's deed of 1909 from Fuchs and Jones the Moores and McManus tracts are clearly put in the southernmost survey, but in this respect the description used in the deed differs from that in the judgment. It appears that the description of the survey in suit and of the southernmost survey used in Fuchs' judgment do contain latent ambiguities; each description contains elements pertaining to the other survey; and it is a question whether the evidence resolves these ambiguities as plaintiffs contend. The conflicting elements of description are specific. However, a resolution of these ambiguities as plaintiffs contend will not answer the defendants' argument; because parts of the description of the survey in suit have to be rejected. And without the descriptions of the Moores and McManus tracts, and neither is in evidence, it cannot be determined that the exceptions were intended to refer only to the rejected parts of the description of the survey in suit. It remains just as possible that the exceptions of the Moores and McManus tracts were intended to refer to the survey in suit as to the survey designated by the rejected elements (which would refer to the southernmost survey); and if a mistake has been made in the descriptions of the excepted tracts, parol evidence might or might not be admissible to show that said tracts were in the southernmost survey.

We have considered whether circumstances show that the Moores and McManus tracts were *not* in the survey in suit. We note, however, that beginning with 1884 (there is a gap in the evidence respecting the years between 1878 and 1884) H. C. McManus was assessed 213 acres in Abstract Number "184/186" annually during a period ending with 1888, or five years, and annually during the period 1891 to 1898, inclusive, or seven years. *184* is the abstract number of the bottom survey and *186*, of the top survey. McManus was assessed 80 acres in this way from 1899 to 1904, inclusive, but with the last year our information about his assessments ends. J. M. Moores was assessed 120 acres in Abstract "184/186" in 1896 and 1897, and was assessed 160 acres from 1898 to 1900, inclusive. The Comptroller's certificate from which this information is taken purports to cover Abstract 186, which is the survey in suit, and the form of the assessments indicates that the tax assessor did not know what survey the Moores and McManus tracts were in. This evidence leaves us in the same uncertainty; at least

it cannot be said that the circumstances proved conclusively that these excepted tracts are in the bottom survey instead of in the survey in suit.

These comments determine against plaintiffs their claim of title under the persons for whom Von Rosenberg acted and we will now consider other claims of title asserted by plaintiffs.

■ On March 6, 1918, the trial court rendered a judgment in cause No. 5385, styled I. A. Stein v. Conrad Fuchs, against a number of people cited by publication, most of whom were named as principals in the power of attorney to Von Rosenberg of 1880. But among these defendants were "the unknown heirs of Conrad Eigeneaur, deceased." This judgment awarded the title to and the possession of the land in suit, among other lands, to Stein and the rights thus acquired by Stein are now held by the plaintiffs, or some of them. This judgment is referable to Article 1875, R.S. 1911, Vernon's Ann.Civ.St. arts. 2040, 2041; the amendment of 1917 is immaterial. We have concluded that the persons for whom Von Rosenberg acted were not proved to be the heirs of "Conrad Eigeneaur, deceased" to whom the basic certificate issued and to whom the land was patented. There is nothing in evidence which connects others of the defendants in judgment with the title to the land. Accordingly, the plaintiffs in the suit at bar, by virtue of this judgment against the unknown heirs of Conrad Eigeneaur, deceased, have proved a title to the land in suit which is at least prima facie good.

This conclusion requires that Point 1 be overruled, if defendants intend that point to attack plaintiffs' claim under this judgment.

Point 19 assigns as error that the trial court held that this judgment "was binding upon and operated to destroy any title to the land in suit theretofore held by Thomas Slattery and his heirs." The present defendants, their sister Mayme, and the parents of these three, namely, Thomas and Kate Slattery, were not parties to this judgment and plaintiffs concede that the judgment divested them of nothing. In their second brief the present defendants argue that this judgment does not connect plaintiffs with the title if the colonist's heirs were the persons named in Von Rosenberg's power of attorney. These persons were not proved to be the colonist's heirs and Von Rosenberg's deed indicates that they were not all of the heirs under the descents they claimed. The second brief of the present defendants also refers to the Tackaberry power of attorney but it is not in evidence. Point 19 is good in part but it does not affect the judgment to be rendered.

Plaintiffs also proved claims of title under two judgments foreclosing tax liens on the land and under sales had under at least one of them. Both judgments were rendered by the trial court. The first was dated September 2, 1902, and the suit was by the State against unknown owners. The sheriff's deed which plaintiffs proved under this judgment, but which purports to convey land other than that mentioned in the judgment, was dated July 8, 1903, and was made to Wirt Davis under whom at least some of the plaintiffs claim. Under Point 17 it is argued that the judgment did not bind the defendants' interest because neither defendants nor their predecessors were unknown owners, and this Point 17 is sustained for reasons stated in the defendants' argument under this point. Point 16 refers to the difference between judgment and deed but is immaterial under the conclusion just stated.

The second of the two judgments mentioned was dated February 11, 1913 and the suit was by the State against Hattie B. Stone and many other persons. Judgment was rendered against only some of these defendants but among them was Thomas Slattery as well as the unknown heirs of Conrad Eigeneaur and others whom an affidavit for publication (contained in a bill of exceptions) lists as heirs of Conrad Eigeneaur. A sale was had under this judgment at which Stein was the purchaser. Under Point 18 it is argued that this judg-

ment did not bind the defendants' interest because Thomas Slattery was dead when the suit was filed. · Thomas Slattery died in 1889. The taxes adjudged the State began with those levied ·for 1890 and from this and the fact that the judgment was rendered in 1913 we infer that the suit was filed after Thomas Slattery died. Point 18 is therefore sustained but it does not affect our judgment, independent of other claims.

We understand, from statements made at pages 111 and 112 of the plaintiffs' first brief replying to Points 16, 17 and 18, that plaintiffs claim nothing on this appeal under these last two judgments.

We turn now to one of defendants' claim of title by adverse possession. The defendants contend that the evidence required the trial court to submit to the jury the issue, whether they had title to the land in suit by virtue of adverse possession under Article 3193, R.S.1879, and its successor, Article 3342, R.S.1895, Vernon's Ann.Civ.St. art. 5509. This was the 5-year statute and the possession on which the claim by defendants under this statute is based is attributed by them to their father, Thomas Slattery, and after his death, to their mother, their sister Mayme and themselves.

Thomas Slattery claimed the land in suit under a deed to him dated May 28, 1877 from George I. N. Zabriskie, Assignee in Bankruptcy of Chisholm, et al. This deed was filed for record on June 28, 1877 and it purported to convey all of the survey in suit except 50 acres in the northwest corner which was excepted.

·· Thomas Slattery and his family removed their residence from New York City to Liberty in 1885, in or about May of that year. Thomas Slattery died intestate in 1889, being survived by his wife, Kate Slattery, and three daughters; and an administration was opened on· his estate in March, 1890. Mrs. Slattery married E. W. Anderson on October 31,·1890, and in·1903, she and Mr. Anderson and the three daughters removed their ·residence to Beaumont, where they subsequently resided.

There is no evidence of possession by Thomas Slattery before he established his residence in Liberty in 1885, and there is no evidence of possession by his family after 1894 (at the latest) until their re-entry in 1919. The maximum period to be considered thus begins in 1885, in or about May, and ends with 1894 and this conclusion is in accord wtih the period claimed by the defendants. However, the taxes for 1890 became delinquent, the receipt therefor being dated April 6, 1891. The taxes for 1893 charged to the children of Thomas Slattery also became delinquent; the receipt, made to a guardian, is dated April 24, 1894. There is no direct evidence that Kate Slattery paid a tax for 1893 and we have concluded that such a payment by her was not proved by circumstances. It is unnecessary to consider the evidence respecting payment for 1892. The maximum period thus to be considered is reduced to one beginning in 1885 as stated and ending with 1889 or at the most, in 1890, five years after this period began. See: 2 Tex.Jur. 281 (Sec. 153).

The evidence concerning possession by Thomas Slattery during this period to be considered actually shows no possession prior to 1886 and consists in part of circumstances. On February 1, 1886, Thomas Slattery filed a brand which was registered on March 12, 1886. Doubtless this indicates an intent to comply with Chapter 1, Title XCIII, R.S.1879, Vernon's Ann. Civ.St. arts. 6890, 6895–6898, requiring certain animals to be branded and providing for the registration of an owner's brand. Further, by a writing dated June 12, 1886, one P. R. Key transferred to Thomas Slattery his brand and his cattle in Liberty County. The consideration was $128 and the number of cattle was not stated. The effect of defendants' argument is that these ·circumstances indicate an intention by Thomas Slattery to acquire or deal in cattle. These are at least the earliest circumstances so indicating. There is no affirmative evidence showing that he ever put the cattle he bought from ·Key on the land in suit or showing what he did with the cat-

tle, but there is evidence that Thomas Slattery did establish a pasture on the land in suit and that he did have cattle in the pasture.

Vanya's testimony shows that he was born in 1870, and he said that when he was 16 or 17 years old, which must accordingly, have been in 1886 or 1887, he went on the land to help Major Dark make a survey and that at this time the land in suit was known as the Slattery tract; that the Vanya road crossed the survey in suit; that at this time he saw an old fence on the east side of the survey in suit which went to the Abshire survey but did not cross the Vanya road; and that he saw this fence after the survey but it did not stay there too long. He did not know how much area this fence enclosed. He also said that he had seen a fence enclosing a pasture, "a fence around the Eigeneaur survey what Mr. Slattery claimed;" and he said that this fence did cross the Vanya road; "it went straight across the road—west and east too." However, he testified that this fence was not there at the time of the survey by Major Dark; his testimony plainly distinguishes the two fences. So, according to Vanya, Thomas Slattery did erect a fence enclosing the land he claimed and this must have replaced the old fence which Vanya saw at the time of Major Dark's survey, but Thomas Slattery did not erect his own fence until after Major Dark's survey—which was, as we have stated, in 1886 or 1887. The evidence does not show who used the old fence Vanya saw on the east side of the survey in suit, and the fact that Thomas Slattery replaced it with another indicates that he did not use it for a pasture. Vanya said that he saw no horses or cattle inside it. The defendant Nora Slattery testified that she accompanied her father and the other members of her family to the land in suit; that on these occasions they would stay several days, residing in a house which was in the pasture, and that her father had horses and cattle there which he tended on these occasions. However, defendant Nora Slattery was born on July 21, 1884 so that her recollec-

tion evidently does not go back as far as 1885.

■ There is no other evidence concerning use and possession during the period under consideration (which begins in 1885 and ends with 1889, or in 1890, five years later) and this just stated shows no possession prior to 1886. The earliest circumstances are Thomas Slattery's registration of a brand and his purchase from Key and these occurred in 1886. Vanya's testimony shows that Thomas Slattery erected a pasture but this cannot be put back as far as 1885. Defendant Nora Slattery's evidence of trips to the land with her father cannot be extended back into 1885, and it probably refers to a period after 1886. The contentions of defendants that the evidence respecting Thomas Slattery's use and possession of the land raised an issue for the jury under the 5-year statute is overruled. This contention is made under Points 20, 21 and 22; these points are referred to below in connection with other claims of title by adverse possession.

We come now to another contention of title in defendants. Under Point 9 defendants argue that they made such circumstantial proof of acquisition of title by their father, Thomas Slattery, as required submission of an issue to the jury. The rule invoked by defendants is that usually referred to as the presumption of a grant or deed, but the contention of the defendants involves acquisition of title in some general and unidentified way and not the existence of some specific deed or deeds. Point 8, with which defendants brief Point 7, thus identifying it with the subject matter of Point 8, and Point 10 are related to the subject matter of Point 9 and will be considered first.

■ Thomas Slattery's claim of title originated, as we have stated, with the deed dated May 28, 1877 made to him by Zabriskie, Assignee in Bankruptcy of Chisholm, et al., subsequent to an adjudication made on June 26, 1875. This deed recites an order of sale and a sale at public auction in the State of New York in

compliance with said order, both in 1877, but no order of sale was otherwise proved; and it is assigned as error in Point 8 that the trial court ruled that the assignee's deed was not proof of title into Thomas Slattery for the reason that no order of sale was proved. The Bankruptcy Act of 1867, 14 Stat. 517, as amended, was in force on the date of the assignee's deed; and it was held in Curdy v. Stafford, 88 Tex. 120, 30 S.W. 551, of an assignee's deed dated May 29, 1872 that proof of an order of sale was unnecessary, and this holding was repeated in Beall v. Chatham, 100 Tex. 371, 99 S.W. 1116, of a sale in 1870. The conclusion stated in these two decisions seems also to have been assumed in Pope v. Davenport, 52 Tex. 206, where the sale must have occurred between October, 1875, and May 31, 1877. We do not have the relevant Federal statutes at hand and note that in Webb v. Haskitt, Tex.Civ.App.; 25 S.W. 161, the Court of Civil Appeals refers to an amendatory act, dated June 22, 1874, which regulated sales in bankruptcy. However, the last part of the opinion indicates that no order of sale was required under that statute if the sale was at public auction, and such a sale is recited in the assignee's deed to Slattery which is, of course, an ancient document. In connection with these decisions it is to be noted that the assignee's sale has been acquiesced in by all parties concerned therein and that claim under this sale and the assignee's deed has been made by the purchaser, Thomas Slattery, and by his heirs, all for more than 80 years. Point 8 is sustained. We hold that the assignee's deed conveyed to Thomas Slattery the bankrupts' interest in the land in suit, if any such interest they had. Point 7 seems to add nothing and it, too, is sustained, at least to the extent that it covers Point 8.

It is asserted under Point 10 that the evidence at least required submission to the jury of the issue, whether Adophus Sterne, the administrator of Conrad Eigenauer sold to one Benajah Thompson the certificate under which the land was located and patented, and defendants would base this sale on the order, hereinafter mentioned,

passed at the September term, 1839. This contention seems to be made to avoid the application of the second section of the Act of January 14, 1841, Paschal's Digest, Art. 1399, and to fix Benajah Thompson as a possible source of the title into Thomas Slattery which, the defendants say, they proved by circumstantial evidence.

The estate of Conrad Eigenauer was administered in Nacogdoches County. Two orders of sale were proved, one passed at the September term, 1839, and another on January 25, 1841, this second being after the Act of January 14, 1841, took effect. It is plaintiffs' contention, that this statute did apply to the order of January 25, 1841, and that that order was accordingly void, but this contention will not be discussed. Both orders authorized a sale of the same three land certificates, one being the certificate under which the land in suit was located and patented; and the application for the last order alleged that sales could not be perfected under the first order, for the reason that the administrator had not obtained authority from the Secretary of War. An inventory and appraisal listing these certificates as property of the estate was filed on the same date as was the application granted on January 25, 1841. The only evidence of sale to Benajah Thompson consists of statements made by Sterne in two reports filed by him in 1849, one on March 2, 1849, and the next on September 24, 1849. In the first Sterne stated: "A certificate for one-third of a league of land belonging to said estate was sold by order of the—Court—to Benajah Thompson for two hundred dollars on a credit of one year; that said Benajah Thompson has not paid said amount, but has informed your deponent that said certificate is lost, and the (said Thompson) desires your deponent to advertise said certificate as lost, and having obtained a duplicate to take it back, and dispose of it as may be best for the estate, in as much as said Thompson does not intend to do anything in the matter, your deponent has written to said Thompson requesting him to relinquish the deed and send it back to your deponent in order that such steps may be taken to secure the

rights of the estate, as well as of your deponent." In the next report it is shown that another of the three certificates, one for 1960 (probably 1920) acres given for military services was sold in 1841. Concerning the certificate under which the land in suit was located and patented Sterne said: "There was also sold for two hundred dollars another certificate for one-third of a league of land on a year's credit to Benajah Thompson, who failed to comply with the conditions of the sale, and soon after the purchaser lost said certificate, and has asked your deponent to take steps to get a new certificate, and keep it for the benefit of the estate; that he (said Thompson) was unable to comply with his contract; that your deponent did take said steps, by obtaining the certificate, which is *now in his possession unlocated*." No date for the sale to Thompson was given. It was shown further that the third certificate, a donation for 640 acres, was still in Sterne's hands unlocated.

There is no evidence that Thompson ever had the land in his possession or that he ever made any claim except as appears from Sterne's statements. No assessment for taxes was made to him. No other transaction connecting him with the land was proved.

Defendants say that this evidence shows a sale to Benajah Thompson which ought to be referred to the order of sale passed at the September term, 1839, and not to the later order of January 25, 1841. This contention is overruled. In the first place, the inventory filed when the application for the later order was filed lists the certificate as property of the estate. Next, the only reference to this sale is in the two quotations made from Sterne's reports, both made in 1849, and neither quotation shows when the sale was made nor what order of sale it was based on, unless, perhaps, by inference, that it was sold in 1841. Next, defendants' contention is a collateral attack on the order of January 25, 1841 which authorized a sale of the same three certificates authorized to be sold by the earlier order of 1839, and is based on allegations which show that no sale had been made under the order of 1839. Next, it should be noted that in his report of September 24, 1849 Sterne stated (under oath) that one of the three certificates actually had been sold in 1841 and it is reasonably to be implied that this sale occurred *after* the order of January 25, 1841 which authorized this to be done. If this be true respecting one certificate why not as to others? We see no basis for this argument of the defendants.

Defendants also say that the evidence respecting a rescission of the sale to Benajah Thompson consists only of statements made by the administrator and that the truth of these statements was a question for the jury. However, the only evidence which shows that a sale was made consists of statements in the same documents in which the administrator made the statements showing that the sale had been rescinded, and that he was exercising dominion over the certificate. If the one is entitled to credence so is the other, and supporting the statements showing a rescission is the complete absence of any evidence that Benajah Thompson ever dealt with or claimed the land or the certificate, except as the administrator reports.

██ We hold that *if* there is any competent evidence of a sale to Benajah Thompson, the circumstances in proof demonstrate as a matter of law that this sale was rescinded by Thompson and the administrator and that the latter reacquired the certificate.

Point 10 may be overruled on the basis of these conclusions, for the argument under this point is that a sale to Benajah Thompson was made under the order for sale granted at the September term, 1839.

These conclusions bring us to Point 9 and to defendants' main contention respecting circumstantial proof of title. It is our conclusion that the evidence shows the estate of Conrad Eigenauer to be the owner of the basic certificate on the date of the last proceeding in that estate proved, namely, Sterne's report of September 24, 1849. No sale prior to that was proved except perhaps the rescinded transaction

with Benajah Thompson and no presumption of conveyance by the administrator, Sterne, can be made because it was not shown that the records were unavailable. Doubtless this administration was finally closed or did lapse, and the basic question raised under Point 9 is whether the defendants raised an issue for the jury, on circumstantial proof, that title had been acquired by them under their father prior to the time in 1895 when Von Rosenberg asserted claim in behalf of his principals in his transactions with S. M. Johnson.

■ The rule of decision which controls the determination of this contention by the defendants was stated as follows in Magee v. Paul, 110 Tex. 470, at page 478, 221 S.W. 254, at page 256: "Since it is not consistent with human experience for one really owning property of value to assert no claim thereto, but to acquiesce for a long period of time in an unfounded, hostile claim, the rule is sound which permits the inference that an apparent owner has parted with his title from evidence, first, of a long-asserted and open claim, adverse to that of the apparent owner; second, of nonclaim by the apparent owner; and third, of acquiescence by the apparent owner in the adverse claim."

We will limit our discussion to that of the evidence which pertains to the third element stated, namely, "acquiescence by the apparent owner in the adverse claim," and will repeat only such as is necessary to explain our holding. Under "apparent owner" we will include, in our discussion, all persons identified by the evidence whose claims may be inconsistent with that of the defendants.

■ What proof is necessary to show such acquiescence and the effect which failure to make the required proof has appears from the following decisions, in addition to that in Magee v. Paul, just cited: Walker v. Caradine, 78 Tex. 489, 15 S.W. 31, 32; Baldwin v. Goldfrank, 88 Tex. 249, 31 S.W. 1064, 1069; LeBlanc v. Jackson, Tex.Com.App., 210 S.W. 687; Stephens v. House, 112 Tex. 459, 248 S.W.

30; Masterson v. Harris County Houston Ship Channel Navigation District, Tex.-Com.App., 15 S.W.2d 1011, 67 A.L.R. 1324; Love v. Eastham, 137 Tex. 462, 154 S.W.2d 623; Bruni v. Vidaurri, 140 Tex. 138, 166 S.W.2d 81. According to these decisions *acquiescence* implies knowledge of the adverse claim, and while this knowledge may be proved by circumstantial evidence and in a proper case may be imputed, by inference, to one who resided near the land claimed, nevertheless use of this imputation to prove the knowledge showing *acquiescence* has been severely limited. Thus, in Stephens v. House, [112 Tex. 459, 248 S.W. 33] the Commission said: "Knowledge being held necessary to establish acquiescence, we are not willing to extend the doctrine to those cases where it is necessary to impute knowledge to sustain acquiescence. It might be that, if the owner resides in the immediate vicinity of the land, and that the other party exercised dominion over the land and his claim was notorious, that the knowledge of same would be imputed to the owner. But in this case, where the parties do not reside in the neighborhood of the land, and where they know nothing of it, residing in another county, and there being not even a scintilla of evidence that their ancestors had any knowledge of the claim, knowledge should not be imputed to them of the adverse claim." This quotation indicates, and it is necessarily implied by the rule (shown by the decisions cited) that the burden of proof is on the claimant to prove the knowledge showing *acquiescence,* that the claimant who is asserting circumstantial proof of knowledge must bring into proof such circumstances concerning the other party, his identity, situation, residence, and related matters, as would support an inference that the other party did have the requisite knowledge of the hostile claim. Thus, in Duncan v. Gragg, 242 S.W. 491, at page 493, the Court of Civil Appeals said: "Nor do we think that the fact that no one has ever appeared to challenge the title of McLin Bracy (this person, acting as administrator, caused the original certificate to be issued in 1838, and in 1855, after a

patent had issued to heirs, made the deed with which the plaintiffs asserted claim of title began) and those who held under him is sufficient to justify a finding that Bracy by a lost deed acquired the title of the heirs of Thomas Callahan. We do not think the evidence raises this issue. The heirs of Thomas Callahan are unknown. There is no evidence tending to show who were such heirs, or where they resided. Such being the state of the evidence, the most essential fact necessary to establish execution of a lost deed by circumstantial evidence, that is, the acquiescence by the person who held the title and from whom a deed is sought to be presumed in the adverse possession or assertion of ownership, is wholly wanting."

██ Such being the rules of decision, the evidence relied on by the defendants does not comply with said rules. For the defendants would prove the knowledge showing acquiescence only by inference from circumstances, namely, papers and matters of record in the county in which the land is situated, possession of said land by Thomas Slattery and his family, and reputation in the immediate neighborhood of the land that the land belonged to Thomas Slattery or to his family; and information of these circumstances is such as is not to be imputed to persons who live outside of the county and outside of the immediate area of the land on the issue now being considered. And, as respects the persons to whom the knowledge showing acquiescence must be imputed, the identity and residence of these persons either is not shown or else these persons appear to have been situated at such distances from the land that knowledge of the foregoing circumstances and thus knowledge showing acquiescence in the claim of title by and under Thomas Slattery cannot be imputed to them.

██ In the first place, there is a question between the parties, whether the heirs of Conrad Eigeneauer, for whose benefit the basic certificate issued and to whom the land was patented, have ever been identified; and it is our conclusion, stated above,

that this proof of identity has not been made. The plaintiffs say that the persons who gave the power of attorney to Von Rosenberg in 1880 were those heirs but the defendants deny this, and we agree that the evidence did not establish this heirship. If we are right in this conclusion these heirs have not been identified and we know nothing about them, where they lived or died, or whether they ever knew that they owned this land or not. If Sterne's information about the heirs, which is indicated by his report of September 24, 1849, was correct, these people lived in Germany, and if that indicated by his petition for authority to sell, filed on September 19, 1839, was correct, those people resided beyond the limits of the Republic of Texas. In neither case can notice to them of defendants' claim be inferred from the circumstances listed above.

On the other hand, if the principals in the power of attorney given Von Rosenberg really were the heirs of Conrad Eigeneaur, then the only information we have about them shows them to have been residents of Germany, unless the grantors Von Rosenberg added to his deed to Johnson are to be included and these were declared to be residents of Maryland. Certainly prior to the date of the power of attorney to Von Rosenberg, dated April 11, 1880, there is no basis for imputing to these people notice of the Slattery claim, both for reasons stated and also because there is no evidence that the land had ever been in possession before that date. There was no evidence that Slattery had any possession before 1886. Vanya gave some testimony indicating a reputation of ownership by Slattery earlier than 1886 but nothing in evidence accounts for such a reputation and Slattery did not come to Liberty County from New York until 1885. The defendants argue that the power of attorney to Von Rosenberg implies that the principals knew of the Slattery claim because they authorized Von Rosenberg to sue for and to take possession of the land. However, the authority conferred was in general terms and the power did not identify the land which it was intended to cover except by

describing it as the lands to which the principals were entitled as "the heirs at law of Conrad Eichenaner, (nauer?) deceased" and on the evidence it is as reasonable to suppose that the principals had in mind land located under other certificates as it is to suppose that they had in mind the land in suit. The proceedings in the administration of Conrad Eigenauer's estate, which owned the basic certificate, show two other certificates, one for military services and another as a donation, and Von Rosenberg's power of attorney was filed in Williamson County in 1880, a little more than four months after it was given, and later in Erath County, in 1881, not quite eleven months after it was given, while it was not filed in the county of suit until 1895, or about fifteen years after it was given. The basic certificate under which the land in suit was located and patented was exhausted by the three locations made in Liberty County; and Von Rosenberg's actions therefore indicate that Von Rosenberg and his principals sought first after other land, which must have been located under the other certificates. In his deed to Johnson of 1895, given 18 days before the power of attorney was filed in the county of suit, Von Rosenberg described his principals as residents of Germany as they were described in the power of attorney of 1880, except the additional ones whom he put in Maryland. So, notice to these principals of the Slattery claim between the dates of the power of attorney and the deed cannot be inferred and certainly since the date of the deed to Johnson the claim asserted by the principals in the power of attorney had been active and hostile to the Slattery claim. As for Von Rosenberg he is declared, in every document in which his name appears, to be a resident of Travis County and the first action of his shown respecting the land is the deed and his contract with Johnson of March 1, 1895, taken at a time when the Slatterys' possession had apparently lapsed and the Slattery claim had subsided. We see no basis for a finding that the agent Von Rosenberg ever knew of the Slattery claim, and there is no explanation in evidence as to why he delayed for so many years the assertion of claim to the land in suit—unless it may be inferred that he did not know of the land.

It is unnecessary to consider whether notice of the Slattery claim can be imputed to other persons claiming under Von Rosenberg's power of attorney or to persons asserting claim as or under the Preacher heirs after the Preacher claim became active in 1903 because both lines of claim were active after that time. As regards the Preacher group and claim before the powers of attorney were given to Mr. Pickett in 1903, we have less information on which to base an imputation of notice of the Slattery claim than we have in the case of Von Rosenberg's principals. There is either no proof of residence or else the residence is shown to have been out of the county in which the land in suit is situated. There is some evidence that members of this group had for many years prior to the powers of attorney given Mr. Pickett in 1903 had in mind a claim to this land and there is no evidence that during this period this claim was asserted. However, the evidence indicates that the claim in the mind of these people was adverse to any other, being that of ownership and it seems to us that neither knowledge of nor any consent to the exercise of any claim by others on the part of the Preacher heirs to Mr. Pickett's employment in 1903 was shown.

The only other persons necessary to be considered are those who appear on the tax rolls prior to Simpson, namely, the "Conrad Eigeneaur" to whom assessment was made for 1867 and A. N. B. Tompkins, to whom assessments were made for 1868, 1870 and 1871. If we start the defendants' title with James B. Simpson in 1872, in accordance with the defendants' claim, then there is no basis for any presumption in his favor or in favor of his successors, of notice of his claim. The "Conrad Eigeneaur" of 1867 is only a name on the tax rolls and we have very little more information about Tompkins who appears to be only an early element in the Preacher claim.

█ To summarize, the defendants rely on circumstances to show notice of their claim and these circumstances, namely, matters of record in the county of suit, possession of the land, and reputation of ownership in the neighborhood of the land, are such as mean something only to one who is in the immediate area in which the land is situated or, at most, in the county of suit. None of these circumstances was such as might come into public notice. Residence near and access to the land and information about the land thus become important in determining whether notice shall be imputed; and the persons to be charged with this notice either have not been identified or else have not been shown to be so situated that they would probably get this notice in fact, or else were shown to be residents of a foreign country, or of another state of the Union, or of other counties of this state and outside the normal range and reach of the conduct and circumstances relied upon by the defendants to give notice.

Point 9 is therefore overruled.

The comments above have adjudicated all claims of title by defendants except some based on an adverse possession which began in 1919 and we turn now to consideration of these.

In 1919 the Slattery claim was jointly owned by defendants, their sister Mayme, and their mother, and the reentry in that year was by or in behalf of all of these persons. Their mother died on August 19, 1939. Her second husband E. W. Anderson died March 26, 1925. Mayme Slattery died in March, 1946.

█ The evidence shows that when the defendants began their possession in 1919 the Preacher group had a tenant in possession of a part of the land in suit and the possession which this tenant and his successors had was kept up until in 1941 when the last of them, Gaston Lloyd, left the land and moved to Hull. Mr. Lloyd said that this occurred in September, 1941. These tenancies were not limited to the land in actual possession but purported to cover the land in suit. The tenant in 1919 and his landlords, the Preacher group, had no title in evidence, (unless, perhaps, by virtue of adverse possession, a question we do not determine) but when the consent decree was rendered in Stein v. Thompson-Ford Lumber Company, on November 5, 1923, the merger of the claim of the Preacher group with the claims made by Stein referred the subsequent entries and possession of this tenant to an instrument which did cover all of the land in suit. This instrument was Stein's judgment against the unknown heirs of Conrad Eigeneaur, rendered on March 6, 1918 in Stein v. Fuchs. Stein had this title when he made the Preacher group defendants to his suit against Thompson-Ford Lumber Company. Thus Mr. Pickett testified that Stein first sued Thompson-Ford Lumber Company, to whom the Preacher group had sold timber on the land, but on July 2, 1918, which was several months after the judgment against the unknown heirs of Conrad Eigeneaur was rendered, Stein brought in the Preacher group as defendants. This judgment against the unknown heirs vested Stein with the apparent legal title to the land and the judgment of November 5, 1923 in the Thompson-Ford Lumber Company suit vested the Preacher group with an interest in this title. So, at least from and after November 5, 1923, the date of the Thompson-Ford Lumber Company judgment, the possession of the Preacher group, now become co-tenants of Stein, was under the apparent legal title and in consequence, while it continued, the defendants had no constructive possession of the land in suit and were limited to their actual possession. It is unnecessary to consider the effect of the mixed possession prior to the judgment. No taxes were paid by the defendants after their reentry until 1924 so that after their reentry in 1919 defendants could not have acquired anything under the 5-year statute before the judgment was rendered in Stein v. Thompson-Ford Lumber Company, and 10 years did not elapse between the reentry and the judgment. The result is that de-

fendants could not have had any constructive possession after the judgment until the plaintiffs' possession, or that of the Preacher group, ended. However, after Gaston Lloyd left the land in September, 1941, the Preacher group and their co-tenants, that is to say, the plaintiffs, had no more possession, and there is evidence that Fregia, the tenant whom the defendants then had on the land then moved into and occupied the field which the tenants of the Preacher group had formerly occupied. The evidence concerning this extension of the defendants' possession is summarized in the defendants' third brief; it is sufficient to raise an issue for the jury which, if found in the defendants' favor, would take the defendants' case out of the rule stated in Coleman v. Waddell, 151 Tex. 337, 249 S.W.2d 912 and is sufficient to give the tenant constructive possession of the land in suit described in Thomas Slattery's deed if his tenancy extended so far, and the tenancy of the defendants' tenant Fregia did extend that far. And if the holding of Coleman v. Waddell does not, for any reason, apply to this case there is evidence that defendants and their sister Mayme had an adverse possession on the land after 1941 which met the requirements of the 5-year statute of limitations. At p. 111 of their first brief the plaintiffs have, in effect, admitted that the defendants had an adverse possession on the land. The defendants' claim under the 5-year statute is based upon the deed of May 28, 1877 to their father Thomas Slattery and the plaintiffs have made some question about the sufficiency of this deed to support a claim of adverse possession, on the ground that it is a quit-claim. Defendants' Point 12 assigns as error that the trial court held this deed insufficient to support a plea of limitation. We agree with defendants, for the reasons, stated by them, that the deed was sufficient to support a claim under the 5-year statute and we sustain Point 12. The defendants could claim the benefit of the 5-year statute under their father's deed, being his heirs. See: McLavy v. Jones, 31 Tex.Civ.App. 354, 72 S.W. 407, page 408; Griswold v. Comer, Tex.Com.

App., 209 S.W. 139, with the Court of Civil Appeals opinion at 161 S.W. 423. The possession now being considered was begun by defendants many years after the possession initiated by their father had ceased but this is not material to their right to claim under his deed. The evidence concerning school tax payments shows that the school district in which the land is situated was organized in 1942, that the first levy was made for 1943 and that the taxes levied by this district were paid annually, without delinquency, for the period beginning with 1943 and ending with 1948. Before 1943 school taxes were collected by the county, and the evidence concerning payment of taxes collected by the county (for state, county and school) shows that these were paid annually, without delinquency, for the entire period now under consideration, that is, from 1940 to 1948, inclusive. These payments, or many of them, were divided but the right so to do was granted by Article 7336, V.A.T.S., as last amended in 1939, before this period of possession began, and each divided payment was made prior to delinquency within the time prescribed by that statute. Houston Oil Co. of Texas v. Howard, Tex. Com.App., 294 S.W. 848. Thus, except as their rights were affected by the institution of this suit, the defendants raised an issue for the jury that they had title to that part of the land in suit covered by their father's deed, by virtue of adverse possession under the 5-year statute after plaintiffs' possession, or that of the Preacher group, ended in 1941.

It should be noted at this point that the deed under which the defendants claim excepts 50 acres "off the N. W. corner" of the survey. The defendants have never had actual possession of this 50 acres and so, as to it, the defendants proved no title under the 5-year or 10-year statutes, Vernon's Ann.Civ.St. arts. 5509, 5510.

The present suit was filed on January 27, 1940 and it named as defendants the three Slattery daughters, namely, Anna,

Mayme and Nora. Anna Slattery was served with process not long afterward and the defendants concede that as to the interest she claimed when the suit was filed the suit stopped the running of limitation in her favor. The cases of Mayme and Nora are different. Mayme was never served and died in March, 1946. Nora was not served with process until May 27, 1949. Defendants argue that plaintiffs were not diligent in procuring service of process upon Mayme and Nora and that the suit did not stop the running of limitation as to the interests claimed by either of these two persons, short of the actual service of process made on Nora in 1949.

The first question raised is whether such a lack of diligence has any legal effect. The statute involved is Article 5514, R.S. 1925, which reads: " 'Peaceable possession' is such as is continuous and not interrupted by adverse suit to recover the estate." Plaintiffs say that a suit is an "adverse suit" within the meaning of this statute if it is prosecuted to effect, as this one was; and that diligence in serving process on a defendant is immaterial and that limitation stops as of the date the petition is filed if only the suit be prosecuted to effect. For a reason they say that with a petition on file against them a defendant's possession is not "peaceable" in fact, even though he has not been served with process, and that prosecution to effect shows that the suit was filed with an intention to prosecute it and that it was never abandoned. They also argue that the term "adverse suit" means no more than would the term "brought" and that a suit is "brought" when a petition is filed. For this they cite Hannaman v. Gordon, Tex.Com.App., 261 S.W. 1006.

■ We overrule these contentions. Hughes v. McClatchy, Tex.Civ.App., 242 S.W.2d 799, was a suit to revive a judgment. It was brought within the 10 years prescribed by Article 5532, R.S.1925, and citation issued within the 10 years but was not served; and the jury found, in effect, that plaintiff failed to exercise diligence thereafter to serve the defendant prior to the time the defendant actually was served. Article 5532 provides that a judgment may be revived by "an action of debt *brought*" within 10 years after the date of the judgment, and the Court of Civil Appeals held, 242 S.W.2d at page 803 et seq., on a full consideration of the question and of relevant decisions, that although the statute used the word "brought" the plaintiff was required to exercise diligence continuously to serve the defendant with process, and they affirmed a judgment that the suit was barred by limitation. This decision and the reasoning on which it was based would justify us in overruling the plaintiffs' argument without further discussion; but the Supreme Court has, in effect, given Article 5514 a construction which requires the "adverse suit" to be *prosecuted* as well as *filed*. Article 5514 seems to have been taken from the concluding sentence of Section 14 of the Act of February 5, 1841. Hartley's Digest, Article 2390. The difference between the two provisions is only formal here. Shields v. Boone, 22 Tex. 193, considered Section 14 and held that it required an action to be prosecuted to judgment, to interrupt limitation; but in arriving at this holding the court referred to a provision of Section 39 of the Act of December 20, 1836, Hartley's Digest, Article 2375, and declared, in effect, that this provision was similar to that in Section 14 which they are considering. Said the court: "The object of the lawmakers, in the clause before us (Sec. 14) was to define what is meant by peaceable possession. Their minds were not particularly directed to the subject of the interruption of the statute. In the Act of 20 December, 1836, it was said that 'a peaceable possession can only be interrupted by an actual suit being instituted and prosecuted agreeably to the due forms of law,' etc. We do not think the legislature intended to change this rule." This conclusion has been repeated in Cobb v. Robertson, 99 Tex. 138, at page 147, 86 S.W. 746, 87 S.W. 1148. In Gibbs v. Lester, 41 S.W.2d 28, at page 31, the Commission of Appeals said: "It is well to

remember that article 5514, R.S.1925, is couched in substantially the same language as was used in the original state of 1836." In Burroughs v. Smith, 8 S.W.2d 301, at page 304, the Court of Civil Appeals quoted the terms of the Act of 1836 as a holding made in Shields v. Boone; and this represents, of course, the court's construction of the opinion in Shields v. Boone. These decisions imply that the term "adverse suit" in Article 5514 includes the exercise of diligence in actually serving a defendant with process which was required of the plaintiff in Hughes v. McClatchy.

The next question raised is whether the plaintiffs exercised diligence in serving the defendants Mayme and Nora Slattery with process and the plaintiffs argue that they did. The suit was filed on January 27, 1940 and two citations and two non-resident notices for these defendants were issued during the period which ended with May, 1941. No other process for notice ever issued for Mayme, who died in March, 1946, about five years after the last citation for her; and the next citation to Nora issued on November 5, 1948, more than seven years after the last previous citation for her. The circumstances indicate that after the citation of 1941 the plaintiffs simply abandoned all effort to serve Mayme and Nora with process within any reasonable time and thereafter prosecuting the suit to effect within a reasonable time, and this would be such a failure in diligence as would prevent the suit from interrupting limitation in favor of Mayme and Nora. It is unnecessary to determine whether this failure of diligence was proved as a matter of law; this was, at least, an issue for the jury. As regards the defendant Anna's refusal when the case was called to give information by which defendants Nora and Mayme could be served with process, we hold that this refusal put counsel on notice that he must get his information elsewhere and that defendant Anna's subsequent refusals did not excuse diligence.

■ The next question raised is whether the suit has interrupted limitation as to the interests which the defendant Anna seems to have inherited from her sister, the defendant Mayme. The defendant Anna was served with process in 1940 and it is to be remembered that the action is in trespass to try title. We think that it was unnecessary for the plaintiffs to amend their petition and thus to sue Anna again and to again serve her with process, and that as to the interest inherited by her from Mayme, the suit interrupted limitation in favor of this interest when descent was cast on the defendant Anna. The plaintiffs had nothing further to allege; when Mayme Slattery died the plaintiffs had on file pleadings which authorized proof of the titles claimed by them. Defendant Anna could either have put her new title in proof under her pleading or else could have amended, and the plaintiffs' rights cannot be affected by defendant Anna's failure to amend.

■ So, for the defendant Anna to recover her part of Mayme's interest in the land in suit, 548 acres, under the 5-year statute (less, of course, the 50 acres excepted from her father's deed) 5 years must have intervened between the date when Fregia extended the defendants' possession after the plaintiffs' tenant Lloyd left the land and the date when descent was cast on the defendant Anna. We agree with plaintiffs that where the claimant under a deed is denied any constructive possession by the owners' entry, the claimant does not acquire a constructive possession automatically when the owners' possession ends; but the claimant may acquire a constructive possession under his deed, to the limits of the deed, by taking an additional possession which would itself support a claim of adverse possession, and this is what defendants' tenant Fregia did according to his testimony.

We conclude that at least the defendant Nora has raised an issue for the jury under the 5-year statute, not only to the one-third interest in the land in suit, less the 50 acres excepted from her father's deed, which she would have individually, but also as to the one-sixth interest which

she apparently inherited from her sister Mayme, and this requires reversal of the judgment.

██ This conclusion implies another, that the possession of the plaintiffs, or some of them, after the judgment of 1923 in Stein v. Thompson-Ford Lumber Co., which restricted the defendants to their actual possession because it, the plaintiffs' possession of a part, was by and in behalf of or under the owners, did not capture, that is, did not give the plaintiffs limitation title to the defendants' *claim* to that part of the land in suit which lay outside of the defendants' actual possession during that time. That is, when the plaintiffs' possession ended and the defendants' tenant took up an additional possession, the defendants had not lost the right to claim constructive possession under their father's deed to all of the land in suit covered by that deed of which they did not have or take actual possession (subject, of course, to our conclusion regarding the effect of that suit). The rule of decision that one claiming under a deed has constructive possession beyond his actual possession is not a right in land. The plaintiffs' possession and use of the land in suit as owners being rightful, it gave the defendants no right of action. Articles 5507, 5509 and 5510, R.S.1925, operate, according to the terms of these statutes, from the time the cause of action accrues, and on the evidence before us the defendants had no cause of action against the plaintiffs within the meaning of these statutes because of the plaintiffs' possession and use of the land. See: Southwestern Lumber Company of New Jersey v. Evans, Tex.Civ.App., 275 S.W. 1078; Williams v. Pure Oil Co., 124 Tex. 341, 78 S.W.2d 929; Cox v. Clay, Tex.Civ.App., 237 S.W. 2d 798, at pages 802–803.

These comments pertain to Point 13 and to Points 20 to 31, inclusive. Of these points, Nos. 20, 21, 22, 24, 26, 27, 30 and 31 are sustained. It is unnecessary to adjudicate Points 23, 25 and 28 and we do not adjudicate them. Point 13 is overruled to the extent that it is inconsistent with the conclusions stated. Point 29 is overruled; defendant Nora raised only issues for the jury regarding her claim of title and, of course, this conclusion would apply to the defendant Anna's claim under her sister Mayme to an interest in the 548 acres in suit. The claims of these two defendants to all of the land in suit (less the 50 acres mentioned) come down to one based on adverse possession after the suit was filed.

We have not considered what rights the defendants, Anna as well as Nora, proved to the land in their actual possession, or held by them, their sister Mayme and their mother, between the re-entry made by the defendants and their family in 1919 and the filing of this suit in 1940, and it is not necessary for us to do so since the cause must be remanded for reasons stated above. Accordingly, Counterpoint 10 is not adjudicated nor is the concluding part of Point 13, which seems to refer to this matter. Even though the defendant Anna proves to have no rights in that part of the land in suit which lies outside of this actual possession she may be able to establish an interest to the land held in actual possession by her and her family prior to the filing of this suit in 1940. The plaintiffs have raised a question as to whether the defendants proved the location of their actual possession on the land in suit so that this actual possession can be described in a judgment but this question need not be settled now. Certainly there is evidence that most of the land in actual possession was on the land in suit. The jury could have found, for instance, that the "residence" marked on Mr. Compton's map near the southeastern corner of the Doucette tract was the 2-room house on Mr. Bruce's map and this conclusion would put all, or very nearly all, off the defendants' actual possession on the land in suit. The plaintiffs, at p. 111 of their first brief, have in substance admitted that defendants had an adverse possession on the land in suit.

Point 11 assigns as error that the evidence did not show that plaintiffs had title by adverse possession. The plaintiffs do

not claim on this appeal that they did and they assert no claim in this court by virtue of adverse possession. We have held that the plaintiffs, or some of them, had the apparent legal title to the land. Point 11 is overruled for these reasons.

Points 14 and 15 refer to a claim by defendants of prior possession and both are overruled.

Point 32 is immaterial and is overruled for that reason.

All points of error have been adjudicated. The judgment of the trial court is reversed and the cause is remanded.

On Motions for Rehearing

Ground XII of the defendants' motion is that the evidence shows as a matter of law that plaintiffs did not use diligence to serve defendants Nora and Mayme with process for notice. Our original opinion went no further than the holding that the matter of diligence was at least a question of fact.

Ground 4 of the plaintiffs' motion for rehearing assigns error to our holding that the filing of this suit did not stop the statutes of adverse possession from running against defendants Nora and Mayme, and Ground 5 assigns error to the holding just noted, concerning the effect of the evidence about diligence.

■ We overrule Ground 4 of the plaintiffs' motion. We remain of the opinion, for the reasons stated in our original opinion, that the meaning of the term "adverse suit" in Art. 5514, R.S.1925, includes a requirement of continuous exercise of diligence by the plaintiffs to serve process for notice on the defendants, but we add the following comments, pertaining to arguments made in the plaintiffs' motion. Plaintiffs say that Art. 5514 is not a limitation statute and so decisions like Hughes v. McClatchy, Tex.Civ.App., 242 S.W.2d 799, which we cited, do not apply because these construe limitation statutes. Plaintiffs also say that we have added a requirement to Art. 5514 and they say further

that this statute ought to be construed strictly. The question, of course, is simply what the term "adverse suit" in Art. 5514 means, and it seems to us that our conclusion about the necessity of continuous diligence squares with the word "adverse". And while Art. 5514, considered alone, only defines *peaceable possession*, the term *peaceable possession* is an element of the statutes of adverse possession, and this fact authorizes us to view Art. 5514 as a limitation statute, if that fact be of any significance. Plaintiffs say that the suit is adverse within the meaning of Art. 5514 if only "(a) the suit be filed with a good faith intention that the same be prosecuted to judgment and (b) that it be prosecuted to judgment in good faith following its filing; and that—diligence in the service of citation—is immaterial." We see no reason for distinguishing between a suit filed with *no* intention to prosecute and one filed with an intention to prosecute which, however, is suspended and put aside for a substantial time; and that is what happened here.

■ We sustain defendants' Ground XII and overrule plaintiffs' Ground 5. The facts are stated in another paper and need not be repeated. From these we conclude that when this suit was filed the defendants Anna, Nora, and Mayme had their residence at 538 Pine Street, in Beaumont, and that this place continued thereafter to be the residence of defendants Anna and Nora down to the trial of this cause and the residence of the defendant Mayme until her death in March, 1946. These facts could have been determined easily and quickly; there is no evidence that any of the defendants attempted to evade service or to mislead officers attempting to serve process. It was a question of fact as to how much time defendants Nora and Mayme did spend at their residence; but during the period beginning with the letter of plaintiffs' lawyer, dated August 29, 1941, to the lawyer at Houma, Louisiana, concerning the second non-resident notice for service (and plaintiffs' lawyer never heard from this man) down to the time of the defendant Mayme's death in March, 1946,

the plaintiffs did nothing to effect service on either defendant Mayme or on defendant Nora, and after Mayme's death they did nothing to effect service on Nora until the issuance of a citation to said defendant on November 5, 1948. Since these two defendants did have a residence as stated, and since this could have been easily and quickly located by the plaintiffs if plaintiffs did not know it (and we note that every citation issued in the cause except the two non-resident notices of May, 1941, was procured by the same one of plaintiffs' lawyers and was sent by him to Jefferson County for service at this very address), it seems to us that the exercise of diligence during the period of years when no effort to serve process was made would have effected personal service on said defendants Nora and Mayme before Mayme's death and certainly would have effected service on defendant Nora after the amendment of Rule 106, Texas Rules of Civil Procedure, effective December 31, 1947, authorized substituted service. The plaintiffs finally did resort to the latter rule to effect service on defendant Nora. Accordingly, we hold that plaintiffs did not use diligence to effect service on defendants Mayme and Nora after August 29, 1941. We hold, further, that the explanation given by plaintiffs' lawyer for the suspension of efforts between August 29, 1941, and November 5, 1948, was legally insufficient to excuse the failure of diligence, and as our additional findings show, it really did not cover a material part of the period involved. We hold further that the military service of two of plaintiffs' present counsel during a part of this period of suspension does not affect the question of diligence. One of these two did not come into the record until the intervention of Stubbs, Executor, et al., on January 28, 1949. The other was only one of plaintiffs' original counsel of record, and ever since the suit was filed the plaintiffs have had a lawyer who resided at the town where the trial court sits and who attended to the matter of effecting service of process on defendants and to other proceedings in the cause, not only before but also after the military service of both of the other lawyers came to an end.

In so holding, we are charging the plaintiffs with the conduct of the lawyer who made the efforts to effect service on defendants. He was counsel of record and is presumed to have acted with authority. T.R. 10; 5 Tex.Jur. 449 (Sec. 45). But we are entirely satisfied that the suspension of this lawyer's efforts to effect service between August 29, 1941, and November 5, 1948, reflects in fact the attitude and position of the plaintiffs themselves and does not show negligence on the part of this lawyer of plaintiffs.

It is assigned as error in Grounds XIII and XIV of defendants' motion for rehearing that the evidence shows as a matter of law that by virtue of Fregia's possession, the defendant Nora had acquired title under the five-year statute to one-half of the land in suit, less the 50 acres in the northwest corner. On the other hand, Ground 6 of the plaintiffs' motion assigns as error that Fregia's possession of the Coons-Pickett field after plaintiffs' tenant Lloyd moved to Hull in 1941 did not give notice of adverse claim by the defendants and did not raise the question of fact, whether this possession vested any title in defendants.

We overrule defendants' Grounds XIII and XIV. This contention depends on the effect of Fregia's testimony respecting his possession since the suit was filed, and we hold that Fregia's testimony raised only questions of fact, whether his possession had vested any title in defendant Nora. Most of the evidence to be considered has been separately stated. That of Paul Flowers raised a question as to when Fregia's possession of the Coons-Pickett field became exclusive. Then, Fregia's testimony about Lloyd's conduct raised a question as to how long Fregia's use of the Coons-Pickett field continued to be exclusive. Then, there is some uncertainty in Fregia's testimony as to whether a gate in the fence between Lloyd's tract and the Coons-Pickett field had remained

closed since Fregia had had possession, and this circumstance had some bearing on whether Fregia's use of the Coons-Pickett field was exclusive. See: S.F. 808, 813, 816. Then, there is no confirmation of Fregia's testimony concerning his use of the Coons-Pickett field. All circumstances considered Fregia's testimony only raised questions of fact for the jury, as stated.

■ We also overrule Ground 6 of the plaintiffs' motion. The jury were authorized to find that immediately after Lloyd moved to Hull in September, 1941, Fregia, as tenant of the defendants under a written lease ending December 17, 1942, took possession of the Coons-Pickett field and has ever since held this possession as defendants' tenant, using the field as a pasture, and that this possession was exclusive at least down to the time Lloyd took down the fence between his tract and Fregia's; and the jury were authorized to find that Lloyd did this in 1949, more than five years after Fregia extended the defendants' possession by taking possession of the Coons-Pickett field. It is not material that there is a gap in time between Fregia's lease ending December 17, 1942, and the next, made in 1946, because the jury could have found that he simply held over and remained in possession under the same arrangement with defendants. The defendants claimed title to the land in suit under a recorded deed and in Houston Oil Company v. Niles, Tex.Com.App., 255 S.W. 604, at page 608, it is said: "The possession of any part of the league by Hare was the possession of the defendants or those under whom they claim until such time as Hare terminated the tenancy in the manner recognized by law." So, Fregia's possession of the Coons-Pickett field, being that of a stranger to the plaintiffs and, in fact, a tenant of the defendants, gave notice of the defendants' claim whether Fregia extended the Coons-Pickett field or not and regardless of what Fregia did to the fence about this field; but the jury could have found that his repairs to this fence were so material as to amount to a reconstruction of the fence. The rule of

Coleman v. Waddell, 151 Tex. 337, 249 S. W.2d 912, is satisfied, in so far as it applies to this case. Plaintiffs argue that the record owner could assume, after the expiration of the lease ending on December 17, 1942, that Fregia held possession of the Coons-Pickett field for himself, as a mere encroachment from his own land, but this contention is inconsistent with the rules concerning the effect of possession as notice and the rules that a tenant cannot dispute his landlord's right to possession and that his attornment to a stranger ordinarily does not dispossess the landlord. See Houston Oil Company v. Niles, supra.

Concerning Ground 2 of plaintiffs' motion, which we overrule: We meant to hold that the recitation of heirship in Von Rosenberg's deed to Johnson was not competent under Art. 3597a because it was only a conclusion and was not the statement of facts required by that statute. Plaintiffs argue that by the word "Deed Records" in Art. 3597a the Legislature meant simply the records of the County Clerk, but this gives no effect to the word "deed", and we overrule the contention. We withdraw our statement concerning the Clerk's authority to maintain a separate record for powers of attorney because it was unnecessary. Art. 3597a requires the instrument to be recorded in the deed records, and an instrument shown to be recorded in a record called a power of attorney record has not been shown to be recorded in a deed record, at least with sufficient certainty to justify the use of recitations of facts under Art. 3597a. For the title of the record implies that powers of attorney are recorded there, and these might as well be powers to make mortgages or to do other acts which have no connection with deeds or with instruments having the effect of deeds. For the present, then, we are only holding that the evidence does not make Art. 3597a applicable to the recitations concerning heirship in the power of attorney from Margarethe Laemmer, et al. to W. Von Rosenberg.

We overrule Ground 7 of the plaintiffs' motion and, in consequence, now overrule plaintiffs' counterpoint 10, which we left undetermined in our original opinion. There is evidence that the pasture which Bruce surveyed was the Markantell pasture which Fregia was occupying when the suit was filed. Thus Bruce said that this pasture which he surveyed was east of and adjoining to Fregia's place, and when the size of the pasture surveyed by Bruce is considered, it is apparent that it was the one Fregia had taken possession of under and following Markantell. Furthermore, the revised field notes to which Bruce testified (S.F. 941, et seq.) delimited land within the fence of this pasture. Bruce's first set of notes had at one place extended a little beyond the pasture fence, but the revised notes corrected this. Finally, Bruce's field notes were based on artificial monuments, that is, trees which he had marked; and he said that if these trees were still standing a surveyor could go on the ground and find the survey Bruce had made. It seems clear, for reasons stated in our original opinion, that most, if not all, of Bruce's survey was on the land in suit, and this being so a judgment awarding the pasture could have been drawn by describing the tract awarded as that part of Bruce's survey within the land in suit, giving Bruce's revised field notes and giving a description of the land in suit. The fact that Bruce did not relate his field notes on to the lines of the Eigeneaur survey does not make his field notes patently insufficient as a description because he related these field notes to marked trees.

We have considered the question, whether the evidence shows, as a matter of law that defendants Anna and Nora had title by adverse possession to the land in the survey which is described by Bruce's field notes but have concluded that this, too, raised only questions for the jury.

It is unnecessary to comment on other grounds of plaintiffs' and defendants' motions for rehearing, and except as noted above, these motions are overruled. We make the following rulings concerning plaintiffs' motion to correct findings: Ground 1 is sustained except that the course is 46½°. The language quoted in Grounds 2 and 3 has been changed. Ground 4 is sustained. Ground 5 is overruled. It is determined by our action on Ground XII of defendants' motion and Ground 5 of plaintiffs' motion.

Our original judgment remains in effect.